**In the Matter of the WELFARE OF the CHILD OF W.L.P. and T.J.S., Parents.**

**Nos. A03–1593, A03–1603.**

Court of Appeals of Minnesota.

May 4, 2004.

Robert M.A. Johnson, Anoka County Attorney, Robert D. Goodell, Assistant County Attorney, Anoka, MN, for respondent.

Sherri D. Hawley, St. Paul, MN, for appellant-mother.

Kathryn J. Cima, Minneapolis, MN, for cross-appellant-father.

Joyce White, White Bear Lake, MN, guardian ad litem.

Considered and decided by HUDSON, Presiding Judge; ANDERSON, Judge; and STONEBURNER, Judge.

## OPINION

HUDSON, Judge.

Appellants, W.L.P. and T.J.S., appeal from an order terminating their parental rights to M.D.D.P. The trial court found that both parties had previously had their parental rights to other children involuntarily terminated, and therefore, W.L.P. and T.J.S. are statutorily presumed to be palpably unfit to parent. Further, the trial court found that W.L.P. and T.J.S. failed to rebut the presumption of unfitness, and it is in the best interests of M.D.D.P. to terminate their parental rights. On appeal, W.L.P. argues that the trial court erred by concluding that: (1) she did not rebut the presumption of palpable unfitness; and (2) it is in the best interests of M.D.D.P. to terminate her parental rights. T.J.S. argues that Ramsey County did not previously involuntarily terminate his parental rights to another child (C.M.S.); rather he voluntarily terminated his parental rights. Accordingly, T.J.S. argues that the trial court erred in applying the statutory presumption that he is palpably unfit to parent. Because we conclude that the trial court was correct in presuming both parties palpably unfit to parent and neither party rebutted this presumption, we affirm.

## FACTS

This is a consolidated appeal challenging the termination of W.L.P.'s and T.J.S.'s parental rights to their son, M.D.D.P. The termination proceedings were heard based on a petition by an Anoka County social worker. The trial court ordered the ter-

mination of W.L.P.'s and T.J.S.'s parental rights.

W.L.P. is the mother of M.D.D.P. and T.J.S. is the putative father. W.L.P. is also the biological mother of six other children: A.K.P., born October 13, 1980; J.L.P. and J.L.P., born October 21, 1985 (twins); S.L.P., born May 4, 1989; B.A.P., born January 27, 1991; and C.M.S., born June 15, 1995. Ramsey County has involuntarily terminated W.L.P.'s parental rights to each of these children. T.J.S. is the father of three children. His parental rights to C.M.S. were terminated based on his admission to a petition to terminate those rights. The trial court concluded that the termination was involuntary, but T.J.S. argues that because he admitted the petition, termination was voluntary.

On March 1, 1990, Ramsey County filed a petition to terminate W.L.P.'s parental rights to four of her children. The oldest three children were placed in Ramsey County's custody in 1987 while W.L.P. was serving a 13–month prison sentence for selling illegal substances. The youngest child at that time, S.L.P., was adjudicated a child in need of services when she tested positive for amphetamines at birth. When W.L.P's children were initially taken in 1987, Ramsey County developed a case plan for W.L.P. that included chemical dependency treatment. Between February 1988 and November 1989, W.L.P. participated in six chemical dependency programs: (1) she completed outpatient treatment at St. Joseph's Hospital; (2) she attended the Genesis program from which she was discharged for failure to attend and tardiness; (3) she was re-admitted to the Genesis program and was again discharged for unexcused absences; (4) she completed outpatient treatment at St. Paul Ramsey Hospital; (5) she was re-admitted to the Genesis program for a third time and was subsequently terminated when

she admitted to smoking marijuana and tested positive for cocaine; and (6) she attended a day treatment program at Ramsey County Medical Center that she did not complete. On May 21, 1990, W.L.P. failed to appear for a pretrial hearing on the termination of her parental rights. The court found her in default and terminated her parental rights to her first four children: A.K.P., J.L.P., J.L.P., and S.L.P.

On June 22, 2001, Ramsey County filed a petition to terminate W.L.P.'s parental rights to B.A.P. and C.M.S. The petition alleged that five factors supported termination: (1) substantial, continuous, or repeated failure to comply with the duties imposed by the parent-child relationship; (2) palpable unfitness to parent; (3) failure to correct the conditions leading to out-of-home placement after being given reasonable services; (4) that the children were neglected and in foster care; and (5) that it was in the best interests of the children to terminate parental rights. Additionally, the petition alleged that five factors supported termination of T.J.S.'s parental rights to C.M.S.: (1) palpable unfitness to parent; (2) failure to correct the conditions leading to out-of-home placement after being given reasonable services; (3) that the child was neglected and in foster care; (4) that he was not entitled to notice of an adoption having failed to register with the putative fathers' adoption agency; and (5) that it was in the best interests of the child to terminate parental rights.

On November 13, 2001, W.L.P. failed to attend the pretrial hearing on this petition and the district court found W.L.P. in default. Accordingly, all the allegations in the petition were deemed to be true and the court terminated W.L.P.'s parental rights to B.A.P. and C.M.S.

On December 7, 2001, T.J.S. waived his right to trial and admitted that all of the allegations contained in the petition to terminate his parental rights to C.M.S. were true. The parties executed a settlement agreement, and the trial court stayed the termination of T.J.S.'s parental rights for 90 days on the condition that he comply with the terms of the settlement agreement. T.J.S. failed to meet the conditions of the stay and on February 19, 2002, the trial court vacated its order staying execution of the termination of parental rights and terminated T.J.S.'s parental rights to C.M.S.

**Termination of Parental Rights to M.D.D.P.**

*a. Testimony concerning W.L.P.*

W.L.P. stipulated that she previously had her parental rights to six children involuntarily terminated. W.L.P. admitted that she has abused chemical substances for 30 years, that she started drinking at age 8, and that she started using methamphetamines at age 21.

In December 2002, W.L.P. told T.J.S. that she was pregnant. T.J.S. did not register with the father's adoption registry either prior to, or after, M.D.D.P.'s birth. T.J.S. in no other way established that he is M.D.D.P.'s biological father. On April 17, 2003, W.L.P. voluntarily admitted herself to the Chemical Dependency Unit at Unity Hospital. W.L.P. told the hospital staff that she was 37 weeks pregnant. She was tested for drugs and her positive test was inconsistent with her statements concerning when she had last used methamphetamine. On April 22, 2003, W.L.P. met with Katey Zeleny, an Anoka County social worker. W.L.P. admitted that she had used methamphetamines a total of four to five times during her pregnancy. W.L.P. had three prenatal appointments while pregnant, and at each appointment she tested positive for methamphetamines.

W.L.P. gave birth to M.D.D.P. on April 24, 2003. The county filed a petition to terminate parental rights on April 28, 2003, contending that W.L.P. and T.J.S. are palpably unfit to be a party to the parent-child relationship. M.D.D.P. was placed in foster care three days after his birth. He has remained in foster care since placement.

W.L.P. remained in the Chemical Dependency Unit at Unity Hospital for approximately 20 days after M.D.D.P.'s birth. She subsequently voluntarily entered inpatient treatment at Dellwood Recovery Center (Dellwood) in Cambridge, Minnesota. On May 11, 2003, Taylor Boaudoin, a licensed drug counselor at Dellwood, completed a substance abuse assessment for W.L.P. Boaudoin testified that his prognosis of W.L.P.'s ability to remain sober was very positive; but the trial court stated that Boaudoin's opinion carried little or no weight with the court because his evaluation was based solely on W.L.P.'s self-reporting. In addition, Boaudoin did not contact any collateral sources including Anoka or Ramsey County. W.L.P.'s primary chemical dependency counselor at Dellwood did not testify. W.L.P. successfully completed treatment at Dellwood and her urine analyses (UA's) at Dellwood were all negative.

On May 28, 2003, W.L.P. entered Pathways House, a transitional housing program in Rochester, Minnesota. At the time of the hearing, W.L.P. was still residing at Pathways House. On July 1, 2003, Tabitha Jeffries, a Pathways chemical dependency counselor, reported that W.L.P. was supportive, sharing, and involved during group sessions, but that she continued to be resentful/blaming, poor at maintaining goals and following house rules, was manipulative, and that she failed to meet house expectations of securing employment within two weeks of entering Pathways. W.L.P. secured employment three months after entering Pathways, one week prior to trial. W.L.P.'s UA's while at Pathways have all been negative. W.L.P. did not ask her chemical dependency counselor at Pathways to testify.

### b. Testimony concerning T.J.S.

T.J.S. has been in and out of prison much of the past six years. The trial court found that while incarcerated T.J.S. has taken advantage of many parenting classes; but T.J.S. has never taken such classes on his own volition while not in prison. Further, the trial court found that his ability to remain sober is not clear because his incarcerations have not provided him the opportunity to use drugs and alcohol.

T.J.S. contended that he voluntarily terminated his rights to C.M.S. because he admitted to the allegations in Ramsey County's petition. The trial court concluded, however, that both W.L.P.'s and T.J.S.'s parental rights had previously been involuntarily terminated. Accordingly, the trial court concluded that both parents were statutorily presumed to be palpably unfit to parent M.D.D.P., that neither parent rebutted the presumption, and that it was in the best interests of M.D.D.P. that the court terminate their parental rights. This appeal follows.

## ISSUES

I. Did the trial court err in finding that W.L.P. failed to rebut the presumption that she was palpably unfit to parent M.D.D.P.?

II. Did the trial court err in concluding that T.J.S.'s prior termination of parental rights was involuntary?

III. Did the trial court err in finding that T.J.S. failed to rebut the presumption that he was palpably unfit to parent?

## ANALYSIS

### I

An appellate court reviews a termination of parental rights to determine whether the trial court's "findings address the statutory criteria and whether those findings are supported by substantial evidence and are not clearly erroneous." *In re Welfare of P.R.L.*, 622 N.W.2d 538, 543 (Minn.2001). We inquire into the sufficiency of the evidence to determine whether the evidence is clear and convincing. *In re Welfare of S.Z.*, 547 N.W.2d 886, 893 (Minn.1996). While we defer to the trial court's findings, we are required to exercise great caution in proceedings to terminate parental rights. *In re Welfare of A.J.C.*, 556 N.W.2d 616, 622 (Minn.App. 1996), *review denied* (Minn. Mar. 18, 1997). Indeed, parental rights may be terminated only for grave and weighty reasons. *In re Welfare of M.D.O.*, 462 N.W.2d 370, 375 (Minn.1990).

The legislature has established nine criteria that support involuntary termination of parental rights. Minn.Stat. § 260C.301, subd. 1(b) (2002). The trial court may also voluntarily terminate parental rights if the parent provides written consent establishing good cause to terminate parental rights. Minn.Stat. § 260C.301, subd. 1(a) (2002). While a trial court may involuntarily terminate parental rights when only one criterion is proven, the primary consideration in every termination case is the child's best interests. Minn.Stat. § 260C.301, subds. 1(b), 7 (2002).

The trial court may terminate a parent's rights if he or she is palpably unfit to parent. Minn.Stat. § 260C.301, subd. 1(b)(4). "It is presumed that a parent is palpably unfit to be a party to the parent and child relationship upon a showing that the parent's parental rights to one or more other children were involuntarily terminated." *Id.* When this is established, it is the parent's burden to prove fitness to be a parent and the absence of other reasons to terminate parental rights is not sufficient to overcome the presumption of unfitness. *In re Welfare of D.L.R.D.*, 656 N.W.2d 247, 250 (Minn.App.2003). Here, W.L.P. stipulated that her parental rights to six other children were involuntarily terminated. Thus, the trial court correctly presumed that she is palpably unfit to engage in the parent-child relationship and it was her burden to rebut this presumption.

W.L.P. argues that the trial court erred by concluding that she did not rebut the presumption that she is palpably unfit to parent. She argues that she rebutted the presumption because she attended chemical dependency treatment after M.D.D.P.'s birth, had no positive UA's, took advantage of every opportunity to visit her child, displayed no concerning behaviors during the supervised visits, started taking medication for her bipolar disorder, obtained a parenting assessment and took parenting classes, and got a job—all without the assistance of Anoka County Social Services.

The trial court acknowledged that W.L.P. has made some positive steps. The trial court concluded, however, that based on her repeated inability to stay sober, even after completing multiple treatment programs, her failure to call the chemical dependency counselors who were most familiar with her current treatment and prognosis for continued sobriety, and her slow progress in treatment, W.L.P. did not rebut the presumption that she is unfit to parent M.D.D.P. We agree.

W.L.P. makes much of the fact that the county failed to offer her either voluntary or court-ordered services to assist with

reunification. But in cases where the court has previously terminated an individual's parental rights, reasonable efforts for rehabilitation and reunification are not required. Minn.Stat. § 260.012(a)(1)(ii) (2002). This court explained in *In re D.L.R.D.*, 656 N.W.2d at 251, that:

[w]hen the presumption of unfitness applies, a parent must affirmatively and actively demonstrate her or his ability to successfully parent a child. We recognize this is a particularly onerous task when, because of the prior termination of parental rights, the statute has relieved the county of the obligation to develop a case plan and make reasonable efforts to reunite the parent and child. To shoulder this burden, the parent, with the assistance of counsel, is inevitably required to marshal any available community resources to develop a plan and accomplish results that demonstrate the parent's fitness.

Here, to rebut the presumption of unfitness, W.L.P. offered her own testimony, the testimony of a counselor who completed an evaluation based solely on W.L.P.'s self-reporting, her ability to attend all of the hearings, and her ability to stay drug free for a three-month period while living in a structured environment.

Clearly W.L.P. has made progress. But based on the evidence in the record, and in particular the fact that W.L.P. has a 30–year history of substance abuse, up to and including using methamphetamine while pregnant with M.D.D.P., the record supports the trial court's finding that the evidence W.L.P. produced at the hearing is insufficient to rebut the presumption of unfitness.

The record shows that at the termination hearing, W.L.P. declined to call the chemical dependency counselors who could most accurately testify about her ability to remain sober and her progress in treatment. Further, while W.L.P. has remained sober and secured employment, she has done so while residing in the controlled environment of the halfway house. Significantly, the record shows that in the past, W.L.P. has successfully completed treatment programs and then relapsed after leaving the program. Finally, after meeting with W.L.P., the guardian ad litem testified that, given W.L.P.'s 30–year chemical dependency history, she would want W.L.P. to demonstrate two years of sobriety before she would recommend returning M.D.D.P. to W.L.P. Based on this record, we conclude that the trial court's finding that W.L.P. failed to rebut the presumption of unfitness was not clearly erroneous.

■ W.L.P. also argues that the trial court should have continued the case for three months to provide W.L.P. the opportunity to demonstrate that she could maintain her sobriety without the safeguards of the halfway house. But because the record supports the conclusion that it could be years before W.L.P. has stability in her life, we conclude that the trial court did not err by refusing to continue the proceedings; especially since trial counsel did not seek a continuance at the time. In addition, the record supports the trial court's finding that locating a permanent home for M.D.D.P. is of primary importance and in the best interests of M.D.D.P.

Because the trial court addressed the proper statutory criteria, and the evidence in the record supports the trial court's determination that W.L.P. did not rebut the presumption of unfitness, we conclude that the trial court did not abuse its discretion by terminating W.L.P.'s parental rights to M.D.D.P.

■ W.L.P. also contends that the trial court did not thoroughly consider whether it is in M.D.D.P.'s best interests

to be parented by W.L.P. "In analyzing the best interests of the child, the court must balance three factors: (1) the child's interest in preserving the parent-child relationship; (2) the parent's interest in preserving the parent-child relationship; and (3) any competing interest of the child." *In re Welfare of R.T.B.*, 492 N.W.2d 1, 4 (Minn.App.1992).

Although the trial court did not go into great detail, it concluded that M.D.D.P.'s immediate need for permanency as well as stable, nurturing, drug-free caretakers outweighs any competing interests. The trial court's conclusion was, again, based on W.L.P.'s 30–year history of substance abuse and the opinion of the guardian ad litem who testified that, given W.L.P.'s prenatal drug use and chemical dependency/relapse history, W.L.P. should have at least two years of demonstrated sobriety before any consideration of returning M.D.D.P. to her. On this record, the trial court did not abuse its discretion in holding that it was in M.D.D.P.'s best interests to terminate W.L.P.'s parental rights.

## II

■ For his part, T.J.S. argues that the trial court erred by concluding that his parental rights to C.M.S. were involuntarily terminated, and therefore the trial court also erred in subjecting him to the statutory presumption that he is palpably unfit to parent. In addition, T.J.S. argues that because he is statutorily presumed unfit to parent, he was denied his due process rights to have the issue of his fitness to parent fully litigated. We find no merit in either argument.

On June 22, 2001, Ramsey County filed a petition to terminate T.J.S.'s parental rights to C.M.S. The petition alleged that five factors supported termination of

T.J.S.'s parental rights: (1) palpable unfitness to parent; (2) failure to correct the conditions leading to out-of-home placement after being given reasonable services; (3) that the child was neglected and in foster care; (4) that he was not entitled to notice of an adoption having failed to register with the putative fathers' adoption agency; and (5) that it was in the best interests of the child to terminate parental rights. On December 7, 2001, T.J.S. waived his right to trial and admitted that all of the allegations contained in the petition to terminate his parental rights to C.M.S. were true. The parties executed a settlement agreement, and the trial court stayed the termination of T.J.S.'s parental rights for 90 days on the condition that he comply with the terms of the settlement agreement.[1] T.J.S. failed to meet the conditions of the stay and on February 19, 2002, the trial court vacated its order staying execution of the termination of parental rights and terminated T.J.S.'s parental rights to C.M.S.

T.J.S. contends that his admission to the allegations in the petition converted the involuntary termination into a voluntary termination. The trial court concluded that the termination was involuntary, and therefore it could presume that T.J.S. was palpably unfit to parent. We agree.

Parental rights may be terminated voluntarily or involuntarily. Minn.Stat. § 260C.301, subd. 1. Voluntary terminations are governed by Minn.Stat. § 260C.301, subd. 1(a), which provides that parental rights of a parent to a child may be terminated "with the written consent of a parent who for good cause desires to terminate parental rights." Involuntary terminations are governed by subdivision 1(b) of the same statute, which provides

---

1. The December 7, 2001, settlement agreement is apparently not in the record, although it is referenced in the March 11, 2002, order terminating T.J.S.'s parental rights to C.M.S.

for termination of parental rights upon a court finding that one of nine enumerated parenting deficiencies exists.

■■■■ The caselaw makes it clear that circumstances that justify involuntary termination do not necessarily justify voluntary termination. *See In re Welfare of J.D.N.*, 504 N.W.2d 54, 56 (Minn.App. 1993). Thus, because in many cases the involuntary petition will not establish good cause for a voluntary termination, we cannot apply a blanket rule that an admission to an involuntary termination petition converts the petition into a voluntary termination. "Good cause" under the voluntary termination statute "exists under a variety of circumstances." *In re Welfare of D.D.G.*, 558 N.W.2d 481, 485–86 (Minn. 1997); *see In re Welfare of K.T.*, 327 N.W.2d 13, 17–19 (Minn.1982) (upholding the trial court's finding of good cause when a one-year-old child had resided in a foster home since birth; the parent had not visited the child; and the parent did not believe she was able to take care of a second child); *In re Welfare of J.M.S.*, 268 N.W.2d 424, 428 (Minn.1978) (concluding that good cause existed when the mother determined that it was in the best interests of her child to have two adoptive parents). *Cf. In re Welfare of Alle*, 304 Minn. 254, 257–58, 230 N.W.2d 574, 576–77 (1975) (holding that good cause did not exist when the parent's sole motivation appeared to be avoiding the financial burden of supporting his adoptive children). It was therefore necessary for T.J.S. to take some affirmative steps to voluntarily terminate his parental rights under Minn. Stat. § 260C.301, subd. 1(a).

Here, we note first that the prior petition was instituted by Ramsey County, not T.J.S. Furthermore, the petition alleged five of the grounds for *involuntary* termination listed in subdivision 1(b). Most significantly, as respondent notes, there are at least two procedures parents can utilize to convert an involuntary termination petition into a voluntary one. Parents can: (1) file a new petition supported by a factual basis articulating good cause and cite to Minn.Stat. § 260C.301, subd. 1(a), as the statutory authority for the petition; or (2) formally amend the original petition to cite to Minn.Stat. § 260C.301, subd. 1(a), as the statutory basis for the petition. Appellant did not avail himself of either procedure or take any other affirmative steps to indicate that he was voluntarily terminating his rights to C.M.S.

■■■ Indeed, all of appellant's actions at the time of the hearing are consistent with the proceeding being one to involuntarily terminate his parental rights. For example, after admitting to the allegations in the petition for involuntary termination of his parental rights, and stipulating to a settlement agreement with the county, the trial court stayed the termination of T.J.S.'s parental rights for 90 days to give T.J.S. an opportunity to *retain* his parental rights, negating his contention that he was relinquishing these rights for good cause. When he failed to meet the conditions of the stay, he neither attended the court hearing to explain the circumstances around his failure to satisfy the conditions, nor did he provide a written relinquishment of his rights for good cause. Therefore, the court proceeded under the involuntary termination petition and adjudicated him unfit.[2] On this record, we

**2.** T.J.S. also alleges that the trial court did not make the particularized findings required by the involuntary termination statute. Although we need not address this issue at all because T.J.S. is raising it for the first time on appeal,

*Thiele v. Stich*, 425 N.W.2d 580, 582 (Minn. 1988), we note that the March 11, 2002, order terminating T.J.S.'s parental rights to C.M.S. (which was issued after T.J.S. failed to satisfy the terms of the settlement agreement and the

conclude that T.J.S.'s admission to the allegations in the petition did not convert the county's termination petition to a voluntary termination. Accordingly, the trial court did not err by presuming T.J.S. palpably unfit to parent M.D.D.P.

■ Further, we conclude that T.J.S.'s related due-process argument lacks merit. T.J.S. was afforded numerous hearings throughout the proceedings terminating his rights to C.M.S. and the current proceedings to terminate his rights to M.D.D.P. He received two hearings in the proceedings terminating his parental rights to C.M.S. At the first hearing he admitted to the allegations in the petition, and at the second he defaulted. T.J.S. also received an evidentiary hearing in the present termination proceedings where he was afforded the opportunity to rebut the presumption of unfitness. To that end, witnesses were called whom he had the opportunity to cross-examine and he had the opportunity to testify himself. Moreover, this court has found that the presumption of unfitness is constitutional if an individual is afforded the right to a full hearing. *In re Welfare of P.T.*, 657 N.W.2d 577, 587–88 (Minn.App.2003), *review denied* (Minn. Apr. 15, 2003). T.J.S. was afforded due process.

### III

■ T.J.S. argues that, in any event, he rebutted the presumption that he was palpably unfit to parent. We disagree.

To support his contention that he is fit to parent, T.J.S. testified about the certificates of life-skills and parenting classes that he received while recently incarcerated. But the trial court noted that if T.J.S. did not attend these programs he would have faced an increase in his prison sentence. T.J.S. did not present any evidence that he would have independently chosen to attend such programs or that completing these classes have improved his ability to parent.

The court found that since 1997, T.J.S. has spent a combined total of one year outside of prison. T.J.S. has a history of drug use, and, while as of the date of trial, T.J.S. had remained sober since July 15, 2001, the trial court found he had likely abstained from drug use because he was incarcerated. T.J.S. provided no evidence of stable employment and provided no information regarding his work history from 1986 though 1993. From 1993 through the present, while not in prison, T.J.S. worked sporadically at his brother's auto body shop. Further, at trial T.J.S. had no permanent plans for where he would live or work once released from prison.

Moreover, when T.J.S. found out that W.L.P. was pregnant with M.D.D.P. he made no efforts to establish his parental rights or assist W.L.P. Further, T.J.S. has two other children from a previous marriage; but T.J.S. testified that he has not seen these children since 1998, and he has failed to provide child support for these children even though there is a court order requiring him to do so.

We conclude T.J.S. has not presented sufficient evidence to rebut the presumption that he is palpably unfit to parent, and that the trial court did not err in finding that it was in the best interests of M.D.D.P. to terminate T.J.S.'s parental rights. Because we conclude that the trial court properly presumed that T.J.S. is palpably unfit to parent, and T.J.S. did not rebut this presumption, we do not reach whether the trial court erred in finding

stay was vacated), incorporated by reference the findings of fact in the original December

7, 2001, order terminating his rights to C.M.S.

T.J.S. unfit under Minn.Stat. § 260C.301, subd. 1(b)(2), (7).

### DECISION

We affirm the trial court's determination that W.L.P. failed to rebut the presumption that she is palpably unfit to parent. Further, we affirm the trial court's conclusion that T.J.S.'s admission to the allegations in the county's petition to terminate his parental rights to C.M.S. did not convert the involuntary termination into a voluntary termination. Finally, we affirm the trial court's determination that T.J.S. did not rebut the presumption that he is palpably unfit to parent.

**Affirmed.**