*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2012).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-0740**

In the Matter of the Welfare of the Children of:
A. J. M. and R. D. S.,
Parents.

**Filed October 14, 2014
Affirmed
Ross, Judge**

Anoka County District Court
File No. 02-JV-13-1226

Gretchen R. Severin, Munstenteiger & Severin, P.A., Anoka, Minnesota (for appellant A.J.M.)

Stephen R. Nicol, Nicol & Greenley, Ltd., Anoka, Minnesota (for respondent R.D.S.)

Anthony C. Palumbo, Anoka County Attorney, M. Katherine Doty, Assistant County Attorney, Marcy S. Crain, Assistant County Attorney, Anoka, Minnesota (for respondent county)

Lauren Cains, Ramsey, Minnesota (Guardian ad Litem)

Considered and decided by Chutich, Presiding Judge; Halbrooks, Judge; and Ross, Judge.

## U N P U B L I S H E D   O P I N I O N

**ROSS**, Judge

Anoka County removed A.J.M.'s four children from her care after doctors discovered that her three-month-old daughter had suffered multiple fractures apparently

from separate incidents of abuse. One year later the district court granted the county's petition for termination of A.J.M.'s parental rights, holding that she is palpably unfit to parent and, alternatively, that a child suffered egregious harm in her care. A.J.M. appeals the district court's decision regarding the two statutory grounds for termination, as well as its finding that termination of parental rights is in the children's best interest. Because the district court's findings were sufficient to support its exercise of discretion as to at least one statutory basis for termination and as to the children's best interests, we affirm.

**FACTS**

One morning in January 2013, A.J.M. noticed that her three-month-old daughter A.S.'s arm was limp and that A.S. reacted in pain even on slight movement. A.J.M. waited until the next afternoon to telephone a clinic for medical advice. A hospital social worker urged her to dial 9-1-1 for an ambulance. The social worker called A.J.M. two and a half hours later because A.J.M. still had not got the child to the hospital.

Hospital doctors examined A.S. when she arrived. They discovered that A.S.'s left upper arm was fractured. A.J.M. claimed that the baby had experienced no trauma, such as a drop or fall. Doctors doubted that the baby could have suffered the injury without her caregivers noticing. They x-rayed A.S. and found fractures of other bones in different stages of healing, reflecting injuries from various incidents at different times. They found fractures of A.S.'s skull, collarbone, right arm, tenth rib, left shinbone, and right foot. The next day, during surgery on A.S.'s broken arm, doctors also found a shoulder blade fracture. A doctor reported that A.S.'s fractures of her rib, shoulder blade, and foot indicated apparent child abuse. The report stated, "[A.S.] is clearly a battered child and

2

her ongoing safety must be a primary concern. She should be considered at great risk for fatal injury without intervention." Police placed A.S. and her three siblings, D.G., A.M., and J.S., on a 72-hour hold. A.J.M. and R.D.S., the man with whom A.J.M. was living at the time, are the natural parents of A.S. and J.S. J.S. was 16 months old. D.G. was nine and A.M. was seven. J.G., the alleged father of D.G. and A.M., is deceased.

In interviews with the Anoka County Sheriff's Office, A.J.M. and R.D.S. admitted to being A.S.'s only caretakers but neither offered any credible explanation for A.S.'s injuries. After A.J.M. initially denied any trauma, both parents stated that A.S. had fallen off the bed at least once. The parents also suggested their one-year-old son might have somehow hurt A.S. R.D.S. attributed the injuries to the baby's own movements while being held or sleeping. Family members reported that A.J.M. smoked marijuana daily and that she acted angrily toward her children when her supply ran out. Detectives discovered that A.J.M. has a history of abusing her children, including a 2010 Indiana incident in which she hit A.M. in the face with a shoe, causing a half-inch laceration.

Doctors examined and genetically tested A.S. for brittle bone disease, ruling out the possibility that she is unusually susceptible to fractures. Also ruling out the possibility, A.S. did not experience any new fractures after being removed from A.J.M.

Three days after A.S. entered the hospital, the district court found that all four children needed protection. The county placed the children in foster care, and the court approved a case plan intended to improve A.J.M.'s parenting.

A.J.M.'s case-plan efforts were inconsistent. The case plan obligated A.J.M. to demonstrate sobriety by submitting to random urinalyses. She completed only 24 of the

49 tests requested by social services, including only 2 of the last 14. A.J.M.'s first test was positive for marijuana, but, apart from a few early spikes, the level of marijuana in her system gradually declined. A.J.M. finally tested negative for marijuana in May 2013, and later tests also produced negative results. The plan also required A.J.M. to complete outpatient chemical-dependency treatment by May 2013, but she had not met this objective by February 2014.

A.J.M.'s case plan directed A.J.M. to complete a psychological evaluation and to accept resulting treatment. The evaluation showed that A.J.M. had problems controlling her impulses and suffered from both recurrent, severe depression and chronic P.T.S.D. A.J.M. underwent treatment for her psychological issues; she was successful in anger management therapy and was prescribed medication. But she continued to "exhibit numerous trauma related symptoms that interfere with [her] daily functioning on a consistent basis."

A.J.M.'s case plan also required her to complete a parenting assessment, which "revealed deficits in [A.J.M.]'s understanding of child development and supporting emotional development." A.J.M. attended parenting classes and made some progress, but it was slow and inconsistent. Because A.J.M. steadfastly denied abusing her children, her parenting training did not include any protective abuse-avoidance measures, thwarting the county's ability to address the physical abuse issues that initiated the case.

A.J.M. began weekly supervised visits with the children after they were placed in foster care. These visits continued until trial except when interrupted by an infestation of bedbugs at her home and then by a period of her incarceration. During the visits, the case

4

worker noticed that A.J.M. had difficulty "interacting with [her] children in age appropriate ways" and failed to recognize safety concerns. Neither the children nor A.J.M. showed much emotion. Social workers opposed allowing her unsupervised contact with the children. A.J.M. also lacked the financial means to meet her children's housing and other needs.

The children adjusted reasonably well to foster care. At the beginning of her placement, A.S. "had a very flat affect, did not make noises and did not interact with others," but soon she was "a very happy baby, easily smiling when talked to" and readily consolable by her foster parents. Her fractures also healed well and no new ones developed. J.S. is detached and has problems with social communication, but he has become more responsive and interactive. Social services reported that D.G. and A.M. seem happier and more talkative. Both D.G. and A.M. wanted to return to their mother. These two older children have been diagnosed as being abused or neglected and are engaged in therapy.

A.J.M. was charged in June 2013 with felony assault in the first-degree and two counts of felony malicious punishment for abusing A.S. Two months later, Anoka County petitioned to terminate A.J.M.'s and R.D.S.'s parental rights on two statutory grounds: that the parents are palpably unfit to parent and that reasonable efforts failed to correct the conditions leading to the children's out-of-home placement. *See* Minn. Stat. § 260C.301, subds. 1(b)(4), (5) (2012).

After a three-day trial in February 2014, the district court terminated A.J.M.'s parental rights based on its conclusions that A.J.M. is palpably unfit to be a party to the

5

parent-child relationship and that a child had suffered egregious harm while in her care. *See* Minn. Stat. § 260C.301, subds. 1(b)(4), (6) (2012). The court did not expressly base its decision on failure of reasonable efforts to correct the conditions leading to the out-of-home placement of the children. *See id.*, subd. 1(b)(5). The district court found that A.J.M. has "limited internal resources and energy to deal with the numerous stressors in her family." It also found that A.J.M's lack of attention to her children's emotional needs, coupled with her poor mental health, present "a significant concern in her ability to parent the children safely and meet all of their developmental needs consistently." Although the court opined that A.J.M. had given her best effort to improve her parenting skills and had made some progress, it found that she had "not made enough progress for the children to be safely returned to her custody" and that her "prognosis was poor for gaining the necessary stability to provide a safe and suitable home for the children within a reasonable timeframe." A.J.M. appeals and challenges each of the bases for terminating her parental rights as well as the court's conclusion that termination of parental rights is in the children's best interests.

## D E C I S I O N

### I

A.J.M. argues that the evidence does not support the district court's decision to terminate her parental rights on the ground that she is palpably unfit to parent. The district court may terminate parental rights if it finds "a consistent pattern of specific conduct before the child or . . . specific conditions directly relating to the parent and child relationship" that have been of "a duration or nature that renders the parent unable, for

the reasonably foreseeable future, to care appropriately for the ongoing physical, mental, or emotional needs of the child." Minn. Stat. § 260C.301, subd. 1(b)(4). A.J.M. does not contest the district court's underlying fact findings. We review the district court's finding of the "ultimate fact" that A.J.M. is palpably unfit for abuse of discretion, keeping in mind that the petitioner bears the burden of proof and must overcome "the presumption that a natural parent is a fit and suitable person to be entrusted with the care of a child." *In re Welfare of Children of J.R.B.*, 805 N.W.2d 895, 901–02 (Minn. App. 2011) (quotation omitted), *review denied* (Minn. Jan. 6, 2012).

A.J.M. argues that the county presented no evidence that safety concerns for the children still existed at the time of the termination trial. She cites the district court's findings that she participated in parenting programs and that her parenting skills had improved, and she emphasizes that her break-up from abusive R.D.S. demonstrates her commitment to providing a safe home for her children. The argument does not persuade us to reverse. The district court did not make any findings regarding A.J.M. and R.D.S.'s alleged separation except to note that A.J.M. had gone to a women's shelter after an incident with R.D.S. R.D.S. was in jail at the time of the termination trial, and the record contains conflicting evidence as to whether A.J.M. intended to separate from him permanently. Most difficult for A.J.M.'s arguments, the allegations of child abuse were directed primarily at A.J.M., not R.D.S. The multiple bone fractures to three-month-old A.S. revealed various incidents of abuse while the child was in A.J.M.'s care. And this abuse was preceded by an earlier incident of physical abuse of A.M. The district court

7

gave little weight to the alleged separation in determining A.J.M.'s parental fitness, and the evidence does not cause us to fault that approach.

Physical abuse can show that a parent is palpably unfit. *See In re Welfare of L.M.M.*, 372 N.W.2d 431, 433–34 (Minn. App. 1985), *review denied* (Minn. Oct. 18, 1985). The evidence was certainly sufficient for the district court to determine that A.J.M. engaged in a pattern of abusive conduct. We are satisfied that the district court made sufficient findings to support its determination that A.J.M. would likely continue to follow this pattern if the children were returned to her. The court reasonably adopted social workers' concerns about future abuse. It found that A.J.M.'s parenting skills remain inadequate despite her cooperation with social services. It noted A.J.M.'s inattention to safety concerns during her visits with the children. It credited the testimony that A.J.M.'s views on parenting correlate to high risk of abuse. It observed that A.J.M. had difficulty learning in parenting classes and made only limited progress. And because A.J.M. never convincingly explained how A.S.'s injuries occurred, the county could not attempt to remedy the misconduct that led to the baby's injuries and threatens the lives and safety of children in A.J.M.'s care. The district court also found that A.J.M. does not understand child development and that her children have special needs presenting challenges beyond her demonstrated parenting ability.

A.J.M.'s lack of parenting awareness is aggravated by her mental condition. The district court found that A.J.M. was still suffering from mental problems and that her mental state impaired her ability to care for her children. Although poor mental health in itself is not a sufficient basis to terminate parental rights, *In re Welfare of S.Z.*, 547

8

N.W.2d 886, 892 (Minn. 1996); *see In re Welfare of Children of T.R.*, 750 N.W.2d 656, 661–62 (Minn. 2008), the district court may terminate rights if a parent's mental illness is likely to lead to a child's harm. *T.R.*, 750 N.W.2d at 661–62. The district court had a sufficient basis to find that A.J.M.'s ongoing depression and anxiety would likely lead to more neglect and abuse.

The district court also found that "there is no indication that [A.J.M.] has maintained sobriety" because A.J.M. missed many of the urinalyses requested in the months immediately before trial. This finding has limited weight. A.J.M.'s case plan warned her that a missed test would be presumed positive. A parent's drug abuse may be an adequate basis for a finding that a parent is palpably unfit if it renders her unable to care for her child's ongoing needs. *Id.* at 663–64. The district court's findings associate A.J.M.'s marijuana dependency with angry episodes in which she physically disciplined her children. Although physical discipline is not necessarily abusive, drug-influenced anger and a lack of self-control can obviously contribute to the kind of abuse that A.J.M.'s children suffered. We observe, however, that all of A.J.M.'s urinalyses indicated negative after April 2013. The reason that the case plan's presumption of drug use is of little weight in this case is that testable metabolites indicating previous marijuana use can persist in the body for extended periods, *see* Robert S. Goodwin, et al., *Urinary Elimination of 11-Nor-9-Carboxy-$\Delta^9$-tetrahydrocannnabinol in Cannabis Users During Continuously Monitored Abstinence*, 32 J. Analytical Toxicology 562, 562 (2008), and A.J.M.'s tests showed a steady decline and eventual negative results.

Notwithstanding the district court's recognition that A.J.M. made substantial effort to comply with her case plan and demonstrated some progress, its determination that she remained palpably unfit to parent her four children must be affirmed. The district court's factual findings regarding A.J.M.'s mental health and poor parenting skills along with a pattern of extreme physical abuse support the court's conclusion that A.J.M. is unfit and will remain so for the reasonably foreseeable future.

## II

The county's termination petition also relied on Minnesota Statutes section 260C.301, subdivision 1(b)(5), as an alternative basis for termination. But the district court's decision never refers to this statutory basis and does not clearly establish whether its requirements have been met. We nevertheless need not address A.J.M.'s challenge to termination on this statutory ground. If one statutory basis for termination exists, review of other possible bases is unnecessary. *In re Children of T.A.A.*, 702 N.W.2d 703, 708 n.3 (Minn. 2005). As we have held, the district court's decision provides an alternative basis to affirm—palpable unfitness to parent.

## III

The district court also found that grounds for termination of parental rights exist under Minnesota Statutes section 260C.301, subdivision 1(b)(6)—egregious harm to a child while in the parent's care. It is unknown to us why Anoka County did not plead this basis for termination in its petition in light of the extraordinary abuse of three-month-old A.S. But it did not, and, as the county concedes, the district court could not rely on this unpleaded ground to justify its decision. *See In re Welfare of Child of B.J.-M.*, 744

N.W.2d 669, 673 (Minn. 2008) (citing Minn. R. Juv. Prot. P. 39.05, subd. 3(a)). Because the evidence supports the district court's termination decision based on subdivision 1(b)(4), however, a remand is unnecessary.

**IV**

A.J.M. also challenges the district court's finding that termination of parental rights is in the best interests of the four children. The best interests of the children is the paramount consideration in deciding whether to terminate parental rights. *See* Minn. Stat. §§ 260C.001, subds. 2, 3, 260C.301, subd. 7 (2012). The best-interests analysis weighs the child's and the parent's presumed interests in preserving their parent-child relationship against competing interests of the child, including having a stable, healthy environment. Minn. R. Juv. Prot. P. 39.05, subd. 3(b)(3); *In re Welfare of R.T.B.*, 492 N.W.2d 1, 4 (Minn. App. 1992).

The district court did not expressly connect its specific findings to its analysis of the children's best interests. A.J.M. correctly argues that an order terminating parental rights must explain the court's rationale for concluding why termination is in the children's best interests. *In re Tanghe*, 672 N.W.2d 623, 625 (Minn. App. 2003). But we have held that a district court's findings may provide adequate support for termination even when those findings are not greatly detailed. *See In re Welfare of Child of W.L.P.*, 678 N.W.2d 703, 711 (Minn. App. 2004). The district court identified several important interests that would be served by its termination decision. The children would gain stability and permanence rather than continue waiting, possibly in vain, for A.J.M. to become a fit parent. The court also cited its factually supported safety concerns. In light

11

of its complete findings, the district court did not abuse its discretion by finding that termination is in the children's best interests.

**Affirmed.**