*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A16-1174**

In the Matter of the Welfare of the
Child of: L. L. E. and E. C. F., Parents.

**Filed December 27, 2016
Affirmed
Jesson, Judge
Dissenting, Ross, Judge**

Clay County District Court
File No. 14-JV-16-697

Brian J. Melton, Clay County Attorney, Cheryl R. Duysen, Assistant County Attorney, Moorhead, Minnesota (for respondent county)

Brian P. Toay, Wold Johnson, P.C., Fargo, North Dakota (for appellant-mother L.L.E.)

E.C.F., Faribault, Minnesota (pro se respondent-father)

Joan Kirk, Moorhead, Minnesota (guardian ad litem)

Considered and decided by Schellhas, Presiding Judge; Ross, Judge; and Jesson, Judge.

## UNPUBLISHED OPINION

**JESSON**, Judge

Appellant-mother L.L.E. challenges the termination of her parental rights, arguing that the district court abused its discretion by terminating her parental rights on the ground that she is palpably unfit to parent her child. Because the district court properly concluded

that mother is palpably unfit to parent the child and because termination of parental rights is in the child's best interests, we affirm.

## FACTS

In May 2015, mother gave birth to her fourth child, B.M.F., who is the subject of these proceedings. Born prematurely, B.M.F. was in the hospital a full month before he was discharged. According to mother, he was placed in foster care immediately upon discharge because of both a domestic incident[1] and mother's parental history. Mother's parental rights to three previous children were voluntarily terminated, but not before two of the children suffered significant trauma.

In 2001, mother gave birth to her first child, C.T., a child whom she habitually failed to adequately supervise. At the age of two, C.T. was found walking alone on busy streets. A child protection case was opened, services were provided, and the case was closed. Four months later, another child protection case was opened after C.T. was again found walking alone, this time along a highway. In 2009 and 2011, child protection cases were opened, in part, because C.T. was engaging in inappropriate sexual contact with other children. Mother believes C.T. has been sexually assaulted on three occasions, including once by a man C.T. considered as "Grandpa." Despite mother's awareness that "Grandpa" exposed C.T. to pornography and masturbated in C.T.'s presence, mother and C.T. continued to spend time with "Grandpa." Further, despite C.T.'s history of inappropriate sexual contact

_____

[1] While under the influence of methamphetamine, B.M.F.'s father, E.C.F., punched mother (when she was pregnant with B.M.F.) in the head multiple times and pulled her off of a bed. Voluntary services were offered to mother, but she did not respond or begin services.

2

with other children, mother allowed C.T. to supervise younger children, including C.T.'s younger brother, M.T., who was born in 2005. In the years following M.T.'s birth, numerous child protection cases were opened based upon C.T.'s sexual contact with other children, inadequate parental supervision, and alleged drug use in the home. Mother struggled with drugs, specifically methamphetamine, which she started using at age 18. Mother described the children's upbringing as negative based on having an abusive father and her drug use.

The father of C.T. and M.T. was physically and emotionally abusive. In May 2011, the father made threats against mother and the children. Big Stone County opened a child protection case and two months later, C.T. and M.T. were placed in foster care. Mother began working on her first case plan, which required refraining from drugs and alcohol, not allowing negative influences around her children, completing outpatient chemical abuse treatment, and undergoing a parental capacity evaluation.[2] A petition to terminate mother's parental rights to C.T. and M.T. was filed in January 2012. However, the petition was dismissed three months later because mother "made significant progress" in her case plan. The district court concluded that mother had exposed her children to repeated incidents of domestic abuse, drug paraphernalia, and drug use, and failed to prevent her children from witnessing sexual situations. But the district court found that mother had made progress "against great odds."

---

[2] The parental capacity evaluation concluded that mother fit the criteria for a histrionic-personality disorder, which made her susceptible to undue influence from others; it recommended that she undergo two or three years of intensive therapy.

Following the dismissal of that termination-of-parental-rights petition, mother went to Sister's Path, a transitional program that provides chemical addiction treatment and housing for single parents. By the end of 2012, she regained custody of C.T. and M.T. After successfully completing the Sister's Path program, mother and the children moved into an apartment in Moorhead in March 2013. Unfortunately, mother's newfound stability was short-lived. After one month, she was fired from her job and subsequently unemployed for some time. After four months, C.T. and M.T. were again placed in foster care after M.T. pulled a knife on another child, painted vehicles in a parking lot, attempted to pour lighter fluid into an automobile gas tank, and was found one mile away from home with another child. Further, mother's new boyfriend, an untreated sex offender named Mike, was staying at the home. Clay County Human Services filed another termination-of-parental-rights petition in August 2013, and the next month, mother gave birth to her third child, N.E., whose father was Mike, the untreated sex offender. N.E. was placed into foster care shortly thereafter. In January 2014, mother voluntarily terminated her parental rights to C.T. and M.T. She moved to Granite Falls where she relapsed into methamphetamine use. Within months, mother's parental rights to N.E. were voluntarily terminated.

Mother started her relationship with E.C.F., B.M.F.'s father, around November 2013. He used methamphetamine during the relationship, was physically abusive, and has prior convictions for domestic abuse, burglary, drugs, and violating a no-contact order numerous times. He is currently incarcerated. His anticipated release is in 2021.

B.M.F. was born in May 2015 and placed in foster care after discharge from the hospital. Mother's out-of-home placement plan required her to: (1) participate in dialectical behavior training, domestic violence counseling, and individual therapy; (2) maintain sobriety, submit to random chemical testing, and attend sobriety support groups; (3) participate in intensive family skills training; (4) maintain employment, housing, and financial stability; and (5) complete and follow the recommendations of a parental capacity evaluation. Mother participated in supervised, two-hour visits with B.M.F, and progressed to unsupervised four-hour visits twice per week. In March 2016, Clay County Social Services petitioned to terminate mother's and E.C.F.'s parental rights to B.M.F.[3]

***Testimony at Trial***

In June 2016, a trial was held, and the district court heard testimony from mother, psychologists, social workers, a relative, and B.M.F.'s guardian ad litem. Between the birth of B.M.F. and the time of trial, mother made significant changes: she maintained sobriety, secured housing, and started employment. Witnesses agreed that she was in substantial compliance with her case plan.

During her testimony, however, mother acknowledged that she had been in abusive relationships in the past that affected her children, with domestic violence perpetrated against her, C.T., and M.T. She permitted a sex offender, Mike, to care for her older children on some occasions. And she had once lived knowingly with "Grandpa," a man

---

[3] E.C.F.'s parental rights were terminated by default.

5

who sexually abused C.T. She agreed that each of the three men she had recent relationships with put her in a situation where she was not providing for the safety of her children. Further, despite past physical abuse by E.C.F., mother testified that she is unsure if her relationship with E.C.F. is over, even though they cannot be together because he is in prison. Mother speaks with E.C.F. by phone weekly, and her strongest support system is E.C.F.'s family.

At the time of trial, mother was seeing two therapists, receiving weekly dialectical behavior group therapy and individual therapy. She had previously completed dialectical behavior therapy in 2012. Mother testified that, if she received custody of B.M.F., she would continue with parenting classes and individual therapy, but not dialectical behavior therapy, because "I would be completed with my [dialectical behavior therapy] so I wouldn't have to do that." Mother was not receiving chemical dependency assistance at the time of trial, and she was attending AA and NA meetings once every two weeks.

Social worker Alex Ishaug testified that mother had complied with her case plan requirements, but had not demonstrated that she could implement the knowledge learned in order to keep her children safe. Ishaug noted mother's pattern "has been to gravitate towards people that aren't healthy and then she tends to overlook the safety of herself and her children for the wants and needs of a man." Despite periods of stability, mother has not broken that pattern in the past, resulting in significant harm to her older children. Mother's refusal to "break away" from her relationship with E.C.F. raised concerns for Ishaug that "there's a pattern there."

6

Two psychologists testified concerning mother's mental health issues. Mother suffers from generalized anxiety, major-depressive disorder, stimulant-use disorder, and dependent-personality disorder. According to Dr. Erica Hoff, a psychologist who treated mother, this dependent-personality disorder causes mother to struggle with independent decision-making and allows her to be easily influenced.

Dr. Hoff testified mother is able to understand and explain the concepts learned in therapy, but it is unclear if mother is applying those skills. Dr. Hoff is not confident that mother can set appropriate boundaries with people who would negatively impact her children, based both on her past behavior and her dependent-personality traits. Dr. Hoff gave mother a fair prognosis, meaning that she has a reasonable chance of staying stable if she remains engaged in appropriate services and maintains her sobriety.

Dr. Krislea Wegner completed two parental capacity evaluations for mother, one in 2013 and one in 2016. There was little change between the two evaluations. In 2013, Dr. Wegner gave mother a highly guarded prognosis, noted her history of making poor choices that compromised the safety of her children, that the treatment she had received had not fixed her underlying dependency issues, and that risks continued for her children. Dr. Wegner's prognosis did not change after the 2016 evaluation; she maintained a highly guarded prognosis, meaning it is likely mother will continue to make poor choices and place herself and her children in high risk situations unless there is "significant intervention and progress."

Because mother was residing in North Dakota during these proceedings, an effort was undertaken to complete an Interstate Compact on the Placement of Children (ICPC) in

order to facilitate a trial home visit. Social worker Jennifer Thoreson worked with mother on the ICPC. Thoreson testified that she found mother to be stable with employment and housing, but denied the request for placement of B.M.F. in mother's North Dakota home.[4] Her report concluded:

> [Mother] is able to verbalize very appropriate future plans and is doing very well right now, because she has significant structure and supports in place. However, I am concerned that if the structure and supports were to be reduced or become conflictual, [mother] would relapse with drugs, enter into violent or abusive relationships and place her child in a situation where he could be physically or sexually abused, and placed at risk of having his physical, developmental and emotional needs unmet.

Guardian ad litem Joan Kirk testified that it was in B.M.F.'s best interests for mother's parental rights to be terminated based on mother's repeated pattern of placing her children at risk, lack of progress, and lack of sustained change. Kirk acknowledged mother's present stability, but testified that she had seen periods of progress in the past but the progress was not sustained.

B.M.F.'s paternal great aunt, who first met mother in 2014, testified that she observed mother change into a more responsible adult, and that she believed that mother would be capable of raising B.M.F. in a safe and sober environment with family help and support. She also testified that a bond existed between mother and B.M.F.

---

[4] Because the ICPC was denied, B.M.F. could not be reunified with mother in North Dakota unless the district court dismissed both the termination-of-parental-rights petition and the CHIPS petition. As a result, a trial home visit, with continued county oversight, was not an option as long as mother lived in North Dakota. *See* Minn. Stat. § 260.93, art. VI (2014) (noting, generally, that no child subject to the compact can be placed into a receiving state until approval is obtained).

8

After trial, the district court determined that mother is palpably unfit to parent B.M.F., concluding:

> Pursuant to Minn. Stat. § 260C.301, subd. 1(b)(4), [mother] is palpably unfit to be a party to the parent and child relationship because of specific conditions directly relating to the parent and child relationship, namely: her chronic and severe child protection history, her chemical dependency history, her persisting dependent personality disorder and her resulting inability to properly care for and keep [B.M.F.] safe independently, which is of a duration or nature that renders her unable, for the reasonably foreseeable future, to care appropriately for the ongoing physical, mental, or emotional needs of [B.M.F.].

The district court also concluded that termination was in the best interests of B.M.F., with the benefits of a safe and stable home for B.M.F. outweighing any competing interests. Mother appeals.

## D E C I S I O N

Mother challenges the district court's conclusion that she is palpably unfit to parent B.M.F. She specifically argues that the district court disregarded the significant progress she made prior to trial, relying instead solely on her past history. We first address that central issue. But because a child's best interests can preclude termination of a parent's parental rights even if one of the statutory bases for termination is present, we also review the district court's determination that termination of mother's parental rights is in the child's best interests.

9

**I.** **Clear and convincing evidence supports the district court's termination of parental rights on the ground that mother is palpably unfit to parent the child.**

A district court may terminate parental rights if there is clear and convincing evidence establishing at least one statutory ground for termination and termination is in the child's best interests. *In re Welfare of Children of R.W.*, 678 N.W.2d 49, 55 (Minn. 2004). This court reviews the district court's findings of fact for clear error. *In re Welfare of Children of S.E.P.*, 744 N.W.2d 381, 385 (Minn. 2008). "A finding is clearly erroneous if it is either manifestly contrary to the weight of the evidence or not reasonably supported by the evidence as a whole." *In re Welfare of Children of T.R.*, 750 N.W.2d 656, 660–61 (Minn. 2008) (quotation omitted). The ultimate determination that the findings fit the statutory criteria is reviewed for an abuse of discretion. *In re Welfare of Children of J.R.B.*, 805 N.W.2d 895, 901 (Minn. App. 2011), *review denied* (Minn. Jan. 17, 2012).

Here, the district court relied upon a single statutory ground to terminate mother's parental rights: that mother was palpably unfit to parent. This required the district court to find (1) a consistent pattern of specific conduct before the child or specific conditions, (2) directly relating to the parent and child relationship, (3) of a duration or nature that renders mother unable to care appropriately for the needs of B.M.F., (4) for the reasonably foreseeable future. Minn. Stat. § 260C.301, subd. 1(b)(4) (2014); *In re Welfare of S.Z.*, 547 N.W.2d 886, 893 (Minn. 1996). In concluding that mother was palpably unfit, the district court made findings in the following areas: (1) mother's history with child protection, including the voluntary termination of her parental rights to three other children; (2) mother's dependent-personality disorder and its effect on her ability to identify risks

10

for her children and choose appropriate romantic partners; and (3) mother's past struggles with substance abuse. We address each area in turn.

The district court's decision chronicled a "long, significant and troubling child protection history" which began in 2002. This history is supported by the record in this case. Mother voluntarily terminated parental rights to her two oldest children, C.T. and M.T., after lengthy stays in foster care and her inability to sustain progress in maintaining a stable and safe environment.

Once she left a structured living arrangement, in March 2013, mother started a relationship with a registered sex offender, who regularly stayed in the parental home. In November 2013, she started a relationship with a different physically abusive individual, E.C.F. Within months, she voluntarily terminated her parental rights to C.T. and M.T., and by the end of 2014, she had also voluntarily terminated her parental rights to her third child, N.E. In September 2014, mother relapsed into methamphetamine use.

Mother's testimony regarding her future relationship with B.M.F.'s father, E.C.F., also supports the district court's finding that if B.M.F. were returned to mother, "it is highly likely that he would end up in the same place that [the older two children] did following the dismissed termination petition." Despite mother's recognition that E.C.F. physically abused her and is currently in prison on drug charges, she admitted to weekly, if not daily, contact with him. She would not rule out a future intimate relationship with E.C.F.

11

The district court also found that mother's dependent-personality disorder persists and is a major cause of her pattern of poor decision-making.[5] A person diagnosed with this disorder, according to the district court's findings, is easily influenced by others, struggles to make decisions independently, and is most stable while in a structured setting. They have a need to please others and adopt the wishes of others as their own. According to the district court, this personality disorder explains mother's past struggles and current stability. Her inability to manage this personality disorder is at the crux of the district court's conclusion that mother has not demonstrated an ability to make good decisions for B.M.F. in the reasonably foreseeable future and, as a result, is palpably unfit to be a parent.

The record supports the district court's findings on mother's dependent-personality disorder and its conclusions based upon those findings. Her dependent-personality disorder was documented by two psychologists, who both noted concerns over mother falling back into old habits, choosing unhealthy relationships, and making poor and risky choices. The testimony of Dr. Wegner is particularly supportive of the district court's findings. Dr. Wegner performed two parental capacity evaluations, in 2013 and 2016. Dr. Wegner did not find progress during this period and notes that mother went through another cycle of behaviors related to substance use, legal troubles, and an unhealthy relationship with a man resulting in another pregnancy. She diagnosed mother with dependent-personality disorder and recommended continued dialectical behavior therapy.

---

[5] The district court found that while mother was diagnosed with anxiety and depression in the past, the more recent parental capacity evaluations do not diagnose her with those conditions, which were "largely due to the chaos in her life and her co-occurring chemical dependency, which is now in remission."

According to her testimony, another relapse was likely unless there is "significant intervention and progress."

Dr. Hoff, who provided therapy for mother since 2012, testified that mother's personality disorder indicates that she is easily swayed by others and that she struggles to make independent decisions. Dr. Hoff was not confident that mother has the present ability to set appropriate boundaries with people who would be a poor influence on her or her children. Mother's refusal to rule out a future relationship with B.M.F.'s father reflects a continued pattern of conduct consistent with Dr. Hoff's description of her personality disorder.

Finally, the district court pointed to mother's past struggles with substance abuse. Although it was universally agreed that mother was clean and sober at the time of trial, mother herself admitted during her 2013 parental capacity evaluation with Dr. Wegner that she will go four years without using, and then "binge" for a full weekend.

Mother argues that evidence of a dependent personality does not render her palpably unfit to parent. She correctly asserts that the existence of mental illness alone cannot justify a termination of parental rights. *In re Welfare of Kidd*, 261 N.W.2d 833, 835 (Minn. 1978). However, courts can and do look to the patterns of conduct of parents suffering from mental illness, and courts may conclude that specific conditions resulting from the mental illness render a parent palpably unfit. *See S.Z.*, 547 N.W.2d at 894; *see also In re Welfare of A.V.*, 593 N.W.2d 720, 721-22 (Minn. App. 1999) (affirming the district court's finding of palpable unfitness of parents struggling with brain injury, anger issues, low cognitive functioning, and personality disorder), *review denied* (Minn. Aug. 25, 1999). Here, the

13

district court did not simply cite mother's disorder as the ground for termination. Rather, the district court looked to the disorder's effect on her ability to parent and make independent decisions, and the district court concluded that it caused poor decision-making and poor relationships and explained her past struggles, current stability, and likely future struggles. In this instance, the patterns of conduct and conditions resulting from the disorder permitted the district court to properly conclude that mother is palpably unfit to parent.

Mother further contends that the evidence does not support the determination that she is palpably unfit to parent because the district court relied primarily on past history and disregarded the significant progress she made in the year before trial. She argues that history, in and of itself, should not render her palpably unfit, particularly given a recent record of stability.

In terminating parental rights based on palpable unfitness, "the evidence must address conditions that exist at the time of the hearing." *S.Z.*, 547 N.W.2d at 893. This includes a showing that the condition, which exists at the time of the hearing, will continue for a prolonged and indeterminate period. *Id.* Here, the district court certainly looked at past conduct, including mother's child-protection history with her three other children. However, the district court ultimately addressed a pattern or condition that existed at the time of the hearing: mother's inability to identify risk and think independently. The district court acknowledged her progress and stability at the time of the hearing, but ultimately concluded that the condition still existed and would continue to exist for the foreseeable future. As the district court found:

14

> The Court commends [mother] for the many changes she has made—resolving legal, criminal issues, maintaining sobriety, and securing and maintaining housing and employment. Nonetheless, these relatively recent changes are outweighed by the risks associated with her significant and not-so-distant child protection and chemical dependency history. The changes are too late to show that [mother]—independently, outside the controlled environment of a supportive living environment and the help of family—is able to parent [B.M.F.], make good choices for him, and keep him safe, given her significant history and tendency to repeat past mistakes.

It is difficult to determine that it is "too late" for a parent-child relationship, particularly where a parent strives so hard to improve. But in determining whether a parent is palpably unfit to be a party to the parent and child relationship, we must consider both the parent and the child. Here, the district court weighed the mother's past, as well as her current mental health condition, to determine whether she was able, for the reasonably foreseeable future, to care appropriately for B.M.F. And the district court appropriately considered mother's past cycles through child protection. Her compliance with case plans only to relapse. A period of stability after which children were returned to her, only to experience trauma and a return to foster care.

As the guardian ad litem testified, it is important to consider "perhaps our mistakes" in hastily returning the two older children to her after a period of compliance. This child, she testified, deserves a permanent home. Here, the district court appropriately recognized that past history can inform a judgment regarding mother's ability to meet the child's needs in the reasonably foreseeable future. And it properly addressed the conditions at the time of the hearing when reaching the conclusion that mother was palpably unfit to parent.

15

Where there is clear and convincing evidence that a parent, as a result of a personality disorder, has a history of failing to protect her children from abuse, the parent fails to recognize the issue and make sustained progress in addressing the issue, and there is risk of future abuse, a determination of palpable unfitness is proper. *In re Children of T.A.A.*, 702 N.W.2d 703, 705-09 (Minn. 2005). After a careful review of the record, we conclude that clear and convincing evidence supports the district court's findings. Those findings support a conclusion that mother is palpably unfit to parent.

## II. The record supports the district court's determination that termination is in the child's best interests.

In a termination-of-parental-rights case, the best interests of the child or children is "the paramount consideration." Minn. Stat. § 260C.301, subd. 7 (2014). A district court must make "findings regarding how the order is in the best interests of the child." Minn. R. Juv. Prot. P. 42.08, subd. 1(b).

In analyzing the best interests of the children, the district court must balance three factors: "(1) the child's interest in preserving the parent-child relationship; (2) the parent's interest in preserving the parent-child relationship; and (3) any competing interest of the child." *In re Welfare of R.T.B.*, 492 N.W.2d 1, 4 (Minn. App. 1992). This court applies an abuse-of-discretion standard of review to a district court's finding that termination of parental rights is in a child's best interests. *J.R.B.*, 805 N.W.2d at 905.

We have held that a district court's findings may provide adequate support for termination even when those findings are not greatly detailed. *See In re Welfare of Child of W.L.P.*, 678 N.W.2d 703, 711 (Minn. App. 2004). Here, the district court concluded that

"[t]he benefit to [B.M.F.] of growing up in a safe, healthy, stable environment, where he will have access to the supervision, structure, stability, and guidance that he requires, far outweighs any interest . . . in preserving the parent-child relationship." The district court's findings sufficiently reflect consideration of its best-interests determination. This determination is also consistent with the testimony of B.M.F.'s guardian ad litem, who testified that it was in B.M.F.'s best interests for mother's parental rights to be terminated based on her repeated pattern of placing her children at risk, lack of progress, and lack of sustained change. The guardian acknowledged mother's present stability, but testified that she had seen periods of progress in the past but the progress was not sustained. The guardian ultimately believes B.M.F. needs a permanent home, as did the district court. We agree.

**Affirmed.**

**ROSS**, Judge (dissenting)

I agree with mother L.L.E. that the evidence presented at the trial over her parental rights does not support the finding that she is palpably unfit to parent her child. The supreme court has reminded us that the burden to prove palpable unfitness remains "onerous," requiring evidence of "a consistent pattern of specific conduct or specific conditions existing at the time of the hearing that appear will continue for a prolonged, indefinite period and that are permanently detrimental to the welfare of the child." *In re Children of T.R.*, 750 N.W.2d 656, 661 (Minn. 2008) (quotation omitted). The county presented no such evidence of *any* consistent pattern of *any* specific conduct or *any* specific conditions existing *at the time of the trial* to justify a finding of palpable unfitness. I therefore respectfully dissent.

L.L.E. has a personality disorder she *previously* failed to obtain successful treatment for and that previously influenced poor choices for herself and her children. The district court, however, failed to rely on the circumstances as they existed *at the time of the parental termination hearing*. And neither the district court, nor the county, nor the majority today specifies exactly how L.L.E.'s mental health condition was, at the time of the trial, specifically affecting L.L.E.'s ability to parent now and in the future.

The record instead informs us that the district court relied primarily and substantially on L.L.E.'s personality disorder, not on any specific reasonably foreseeable harm that might flow from that disorder, in deciding to terminate her parental rights. But "mental illness, in and of itself, does not permit termination of parental rights." *Id.* (quotation omitted). And *despite* her disorder, by the time of her parental-rights termination

D-1

trial, L.L.E.'s behavior had radically improved. She had pursued and maintained treatment for her mental condition. She had demonstrated control over her depression and anxiety. She had obtained and maintained her driver's license. She had secured and maintained employment. She had secured and maintained housing. She had addressed and resolved her legal issues. And L.L.E.'s treating psychologist testified that if L.L.E. maintained her sobriety and continued in her services, which she consistently did up to and through the trial, "she has a reasonable chance of staying stable." This undisputed evidence contradicts any finding of palpable unfitness under the statute.

Standing against these remarkable changes, the district court received testimony asserting only vague, unspecified "concerns" about L.L.E.'s ability to parent. In the face of the dearth of contemporaneous evidence, the district court reached back and relied substantially on L.L.E.'s *previous* behavioral failures rather than on the evidence of her actual, present, substantially improved behavior and conditions. And then it terminated her parental rights out of its own similarly speculative and vague "concerns" about the future.

Given the lack of actual evidence, the county has not come close to meeting its "onerous" burden to prove palpable unfitness. I would reverse and direct the district court to reinstate L.L.E.'s parental rights without disrupting the services that precipitated the substantial favorable changes in conduct that L.L.E. undisputedly demonstrated.