*This opinion will be unpublished and*
*may not be cited except as provided by*
*Minn. Stat. § 480A.08, subd. 3 (2012).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A14-0797**

In the Matter of the Welfare of the Child of:
K. A.-P. and D. P., Parents.

**Filed November 3, 2014**
**Affirmed**
**Bjorkman, Judge**

Yellow Medicine County District Court
File No. 87-JV-14-13

Matthew B. Gross, Quarnstrom & Doering, P.A., Marshall, Minnesota (for appellant K.A.-P.)

D.P., Clarkfield, Minnesota (pro se respondent)

Keith R. Helgeson, Yellow Medicine County Attorney, Amanda C. Sieling, Assistant County Attorney, Granite Falls, Minnesota (for respondent Yellow Medicine County Family Service Center)

Sue Peterson-Bones, Willmar, Minnesota (guardian ad litem)

Considered and decided by Halbrooks, Presiding Judge; Connolly, Judge; and Bjorkman, Judge.

**U N P U B L I S H E D   O P I N I O N**

**BJORKMAN**, Judge

Appellant challenges the termination of her parental rights to her youngest daughter, arguing that the district court abused its discretion by (1) determining that the county made reasonable efforts to reunite the family, (2) determining that appellant is a

palpably unfit parent, and (3) admitting expert testimony on matters not disclosed before trial. We affirm.

## FACTS

Appellant K.A.-P. (mother) gave birth to her first daughter, Z.A., in July 2006, during the pendency of her divorce from Z.A.'s father. Mother obtained prenatal care during her pregnancy with Z.A., including treatment for gestational diabetes.

After the divorce, mother struggled with depression, anxiety, and panic attacks but did not seek mental-health treatment. On the weekends when Z.A. was with her father, mother engaged in binge drinking and "random hookups" with strangers. In mid-2009, mother discovered that she was pregnant. She carried the baby to term but did not obtain prenatal care and concealed the pregnancy from her family. Z.A. was at childcare when mother went into labor. Mother did not call anyone for assistance and gave birth in the bathtub. She did nothing to help the baby breathe. She cleaned the bathtub, put the baby's body into a plastic garbage bag, and put the garbage bag into a chest freezer in the basement.

Mother became pregnant again in late 2010. She carried the baby to term but did not obtain prenatal care and concealed the pregnancy from her family. Z.A. was asleep in another room when mother went into labor, and mother repeated the bathtub birth, subsequently wrapping the baby's body in a garbage bag and placing it in the freezer with the body of the other baby.

Mother started dating respondent D.P. (father) in September 2011. Mother discovered that she was pregnant the following spring, and she and father were married in

late June 2012. Mother obtained prenatal care throughout the pregnancy, though she did not disclose the 2009 and 2011 pregnancies, and gave birth to Z.P. in late November.

Around that same time, law enforcement became aware of the dead babies. In anticipation of moving in with father, mother had removed the babies from her freezer, placed them in a cooler, and left the cooler in a wooded area of her aunt's farm in South Dakota. One of her brothers discovered the cooler and the babies' remains on November 2 and contacted authorities. Law enforcement first questioned mother about the babies in December, but she denied having been pregnant or having anything to do with the babies. After DNA testing suggested a biological link between mother and the babies, law enforcement contacted mother again. Mother agreed to an interview at her home on August 13, 2013, when Z.A. would be with her father.

Before law enforcement arrived for the interview, mother hid a loaded gun under the cushions of her couch. She sat on the couch throughout the interview, with nine-month-old Z.P. on her lap. Mother acknowledged that the babies found in the cooler were hers. She explained that she knew she was pregnant each time but was overwhelmed at the prospect of having another child and intentionally hid the pregnancies. After talking with law enforcement for approximately 45 minutes, mother removed the gun from under the couch cushion and placed it to the right side of her head, in the direction of Z.P. As law enforcement sought to retrieve the gun, one shot was fired into the ceiling but nobody was injured.

Law enforcement took Z.P. into protective custody, and Yellow Medicine County Family Services (the county) filed a petition alleging that Z.P. is in need of protection or

services. Mother and father admitted the petition, the district court adjudicated Z.P. in need of protection or services, and Z.P. was returned to father's care.

The county also took steps to address mother's mental health. Immediately following the suicide attempt, mother was hospitalized for psychological evaluation. When her suicidal thoughts persisted after several days, the county successfully petitioned to have mother civilly committed for mental-health treatment. Her treatment diagnoses included anxiety, depression, and panic attacks, and rule-out diagnoses of major depression, bipolar disorder, drug and alcohol abuse, and "antisocial traits." Mother remained in inpatient treatment until the end of September, when she was provisionally discharged to a flex-lock mental-health facility. She was provisionally discharged to her home on November 15, with diagnoses of dysthymic disorder and a severe single episode of major depressive disorder.

But the commitment order remained in place, and mother continued to meet with county mental-health worker Kim Douglass and to follow her commitment case plan, including managing her medication and following treatment recommendations. Mother began therapy with licensed social worker Brian Boersma in mid-November. Boersma indicated initial diagnoses of major depressive disorder and personality disorder, not otherwise specified. In December, mother began treating with psychiatrist Clay Pavlis, M.D. After his initial consultation and document review, Dr. Pavlis diagnosed mother with major depressive disorder; anxiety disorder, not otherwise specified; dysthymic disorder; alcohol abuse; and personality disorder, not otherwise specified. He also noted a number of inconsistencies in mother's reporting of her past conduct.

4

Throughout this time, Amanda Pauling, the county child-protection worker assigned to the family, monitored mother's treatment progress and coordinated case planning with Douglass, father, and mother's family. At Pauling's request, mother met with licensed social worker Deena McMahon for a parenting assessment. Based on multiple interviews with mother, collateral contacts, and review of numerous records, McMahon opined that mother "has serious mental health diagnoses," including personality disorders. She expressed concern that mother is capable of violent acts, does not respond rationally when under stress, does not honestly report her past conduct, and lacks the ability to see how her choices affect her children. And McMahon observed that mother has repeatedly been unable to use the family support system available to her and likely would be "difficult to hold accountable in therapy."

Pauling also asked mother to undergo a forensic psychological evaluation to determine whether Z.P. could safely be returned to mother's care. Mother declined to submit to the evaluation because of potential criminal charges related to the deaths of her babies. Pauling advised mother that the county would need to move to terminate her parental rights if it could not ensure that she could safely parent Z.P. Mother continued to refuse the evaluation.

On January 8, 2014, the county petitioned to terminate mother's parental rights to Z.P., alleging that mother is palpably unfit to parent. Mother continued to experience anxiety and suicidal thoughts throughout early 2014 but reported no specific plans to harm herself. Her commitment expired on February 16, but she continued therapy with Boersma and treatment with Dr. Pavlis through February and March.

5

At the five-day trial in March and April 2014, the district court heard extensive testimony about the criminal investigation into the deaths of mother's babies, mother's civil commitment, and mother's ongoing mental-health treatment and diagnoses, including expert testimony from McMahon, Dr. Pavlis, and psychologist Richard Ascano, Ph.D., whom mother retained in February 2014 for a parental-capacity assessment. The district court ordered termination of mother's parental rights to Z.P., finding clear and convincing evidence that (1) the county made reasonable efforts to reunite mother with Z.P., (2) mother is palpably unfit to parent, and (3) termination is in Z.P.'s best interests. Mother moved for amended findings or a new trial, which the district court denied. Mother appeals.

**D E C I S I O N**

Parental rights may be terminated "only for grave and weighty reasons." *In re Welfare of Child of W.L.P.*, 678 N.W.2d 703, 709 (Minn. App. 2004). Termination requires clear and convincing evidence that (1) the county has made reasonable efforts to reunite the family, (2) there is a statutory ground for termination, and (3) termination is in the child's best interests. *In re Welfare of Children of S.E.P.*, 744 N.W.2d 381, 385 (Minn. 2008). On appeal, we review the district court's factual findings "to determine whether they address the statutory criteria for termination and are not clearly erroneous, in light of the clear-and-convincing standard of proof." *In re Welfare of Children of K.S.F.*, 823 N.W.2d 656, 665 (Minn. App. 2012) (citation omitted). We review for abuse of discretion a district court's conclusion that the statutory requirements for termination

6

have been established. *See In re Welfare of Children of J.R.B.*, 805 N.W.2d 895, 900 (Minn. App. 2011), *review denied* (Minn. Jan. 6, 2012).

## I.  The district court did not abuse its discretion by determining that the county made reasonable efforts to reunite the family.

Before parental rights may be terminated, the county must make reasonable efforts to reunite the child with the parent. Minn. Stat. § 260C.301, subd. 8(1) (2012); *In re Welfare of S.Z.*, 547 N.W.2d 886, 892 (Minn. 1996). "Reasonable efforts" means "the exercise of due diligence by the [county] to use culturally appropriate and available services to meet the needs of the child and the child's family." Minn. Stat. § 260.012(f) (2012). In determining whether reasonable efforts have been made, the district court must consider whether the services were "(1) relevant to the safety and protection of the child; (2) adequate to meet the needs of the child and family; (3) culturally appropriate; (4) available and accessible; (5) consistent and timely; and (6) realistic under the circumstances." Minn. Stat. § 260.012(h) (2012). "[T]he nature of the services which constitute reasonable efforts depends on the problem presented." *In re Welfare of Children of T.R.*, 750 N.W.2d 656, 664 (Minn. 2008) (quotation omitted).

It is undisputed that the problem presented is mother's mental illness. The district court made extensive findings detailing the county's efforts to address the problem, from mother's mental-health commitment to her ongoing treatment, and found these efforts reasonable. Mother does not dispute the appropriateness of the services but argues that the county unreasonably truncated them by seeking to terminate her parental rights before giving her "sufficient time to rehabilitate." We are not persuaded.

7

First, the record amply supports the district court's determination that the county reasonably pursued termination after mother declined to participate in the forensic psychological evaluation. Both the hospital where mother was treated during her commitment and McMahon recommended a forensic psychological evaluation. Pauling considered those recommendations and mother's treatment progress, and agreed that an evaluation was necessary to identify specific steps to address the barriers that mother's mental health present to her parenting ability. Pauling testified that a forensic psychological evaluation is a child-focused assessment and that mother's refusal to participate creates an insurmountable barrier to progress in the child-protection case. The district court carefully considered this evidence, declining to draw an adverse inference from mother's refusal to participate in the evaluation, but crediting Pauling's testimony that mother's refusal makes reunification impossible.

Second, the record amply supports the district court's finding that additional efforts would be futile in light of the timeline necessary to address mother's mental health. The evidence overwhelmingly indicates that at the time of trial, mother continued to experience severe anxiety and depression and regularly had suicidal thoughts. The district court had the opportunity to observe the impact of these conditions on mother first-hand. None of the testifying experts opined that mother's mental-health problems will be sufficiently addressed in the reasonably foreseeable future to permit her to parent appropriately. To the contrary, various experts testified that it will take at least an additional year of treatment to fully address mother's anxiety and depression and multiple years to treat her personality disorder. Without treatment of the personality disorder,

which she was not undergoing as of the time of trial, "the risk of major depressive disorder relapse will become enhanced." In short, additional treatment is unlikely to ameliorate mother's condition enough to enable her to parent appropriately in the foreseeable future.

On this record, we conclude that the district court did not abuse its discretion by determining that the county made reasonable efforts to address mother's mental-health needs and reunite her with Z.P.

## II. The district court did not abuse its discretion by determining that mother is palpably unfit to parent Z.P.

A district court may terminate the rights of a parent who is "palpably unfit to be a party to the parent and child relationship." Minn. Stat. § 260C.301, subd. 1(b)(4) (2012). A parent is palpably unfit when the evidence shows either "a consistent pattern of specific conduct before the child" or "specific conditions directly relating to the parent and child relationship," which the district court determines are "of a duration or nature that renders the parent unable, for the reasonably foreseeable future, to care appropriately for the ongoing physical, mental, or emotional needs of the child." *Id.* A parent's inability to meet the child's needs at the time of the trial or in the reasonably foreseeable future justifies termination. *In re Child of P.T.*, 657 N.W.2d 577, 591 (Minn. App. 2003), *review denied* (Minn. Apr. 15, 2003).

The district court determined that mother is palpably unfit to parent because her severe mental illness interferes with her ability to appropriately perceive and address her own or a child's mental and emotional needs and has led her to endanger Z.P. And the

9

court further determined that mother is unlikely to be able to meet Z.P.'s needs in the reasonably foreseeable future.

Mother challenges these determinations, asserting that the evidence shows that she "was a good mother" and that aside from her suicide attempt in Z.P.'s presence, her conduct did not harm her children. This argument is unavailing. The fact that the district court could have determined, based on evidence that Z.P. was a healthy, normal nine-month-old when removed from mother's care and that mother is generally able to care appropriately for children despite her mental illness, is not dispositive. The mere possibility that the record could support that interpretation of the evidence does not mean that the district court abused its discretion by finding otherwise. *See Vangsness v. Vangsness*, 607 N.W.2d 468, 474 (Minn. App. 2000) (stating that the possibility that the record could support an alternative finding does not mean that the district court erred).

The district court did note the evidence on which mother relies but carefully analyzed the extensive evidence indicating that mother's ability to parent is compromised by her lack of empathy, persistent emotional disconnectedness, deceptiveness, impulsivity, and continued risk of self-harm. The district court found that when faced with the extreme stress of criminal investigation (which itself was the result of mother's mental illness), mother not only could not care for Z.P. appropriately but actively endangered Z.P., and remains incapable of appreciating the long-term effects of her conduct on her daughter. The record contains clear and convincing evidence that mother's mental illness makes her unable to care appropriately for Z.P.

Mother also challenges the district court's determination that her mental illness will continue to present a barrier to her ability to parent, arguing that this determination is contrary to evidence indicating that she has been participating in treatment and her mental health is expected to improve in a "definite period of time." The district court expressly rejected this argument, finding that mother's ability to go through the motions of attending therapy and taking medications does not mean that she is capable of appropriately caring for herself or her child. As we discussed above, mother continued to struggle with severe mental-health problems as of the time of trial, and substantial evidence shows that she needs many years of rigorous therapy. The district court found that mother is not likely to make any significant progress in the foreseeable future because of her demonstrated "ability to block her emotions for years," failure to take advantage of support structures available to her, and poor progress as of the time of trial.

On this record, we conclude that the district court did not abuse its discretion by determining that mother is palpably unfit to parent Z.P.

**III. The district court did not abuse its discretion by permitting mother's psychiatrist to testify about his current diagnosis.**

Whether to admit or exclude evidence is discretionary with the district court. *See In re Welfare of Children of J.B.*, 698 N.W.2d 160, 172 (Minn. App. 2005), *review dismissed* (Minn. May 3, 2005). A district court abuses its discretion if it improperly applies the law. *Kroning v. State Farm Auto. Ins. Co.*, 567 N.W.2d 42, 46 (Minn. 1997). A new trial is warranted based on an improper evidentiary ruling only if the appellant demonstrates both error and resulting prejudice. *Id.*; *see also In re Welfare of Child of*

11

*J.K.T.*, 814 N.W.2d 76, 93 (Minn. App. 2012) (stating that "evidentiary error is not prejudicial if the record contains other evidence that is sufficient to support the findings").

Mother contends that the district court abused its discretion by permitting Dr. Pavlis to testify about mother's appointment with him the week before trial and his undisclosed updated diagnosis. She points to the Minnesota Rules of Juvenile Protection Procedure, which require each party to disclose (1) the names and addresses of all persons intended to be called as expert witnesses at trial; (2) the subject matter about which each expert is expected to testify; and (3) a summary of the grounds for each opinion to be offered. Minn. R. Juv. Prot. P. 17.02(c). Parties also must disclose "additional material, information, or witnesses subject to disclosure" as it is discovered. Minn. R. Juv. Prot. P. 17.06, subd. 1. Our careful review of the record does not reveal a violation of these requirements.

First, the county duly notified mother that it would call Dr. Pavlis, her treating psychiatrist, as a witness and provided a copy of his initial diagnostic assessment. Mother was aware of her ongoing treatment with Dr. Pavlis and could have asked him, at any point before trial, for details about his treatment plan and current diagnosis. Second, nothing about Dr. Pavlis's testimony unfairly surprised mother. In his initial assessment, Dr. Pavlis diagnosed mother with a personality disorder, highlighted "antisocial and/or Borderline Personality Disorder" as rule-out diagnoses, and noted mother possibly has narcissistic traits. At trial, Dr. Pavlis testified that his "new" diagnosis for mother was

12

mixed personality disorder with dependent, antisocial, and borderline personality features.

Moreover, any error in admitting the challenged testimony was harmless because the district court expressly did not rely on it. Rather, the district court noted that it is thoroughly established and undisputed that mother "suffers from severe mental illness," and that while the parties "belabored" the personality-disorder diagnosis at trial, it did "not need to resolve the disagreement among the professionals because [mother]'s actual conduct speaks for itself and is sufficient to find her palpably unfit." On this record, we discern no abuse of discretion and no prejudice.

**Affirmed.**