*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-0039**

In the Matter of the Welfare of the Child of: P. J. M. and A. D. H., Parents

**Filed June 15, 2002
Affirmed
Larkin, Judge**

Hennepin County District Court
File No. 27-JV-14-5116

Mary F. Moriarty, Hennepin County Public Defender, Peter W. Gorman, Assistant Public Defender, Minneapolis, Minnesota (for appellant A.D.H.)

Michael O. Freeman, Hennepin County Attorney, Kacy Wothe, Assistant County Attorney, Minneapolis, Minnesota (for respondent Hennepin County Human Services)

Lee P. Kratch, Hennepin County Public Defender, Minneapolis, Minnesota (for respondent P.J.M.)

Bethany N. Mihalik, Bruce G. Jones, Faegre Baker Daniels LLP, Minneapolis, Minnesota (for guardian ad litem Cathy Terp)

Considered and decided by Larkin, Presiding Judge; Rodenberg, Judge; and Reyes, Judge.

**U N P U B L I S H E D   O P I N I O N**

**LARKIN**, Judge

Appellant-father challenges the district court's order terminating his parental rights. We affirm.

## FACTS

Appellant-father A.D.H. is the biological father of A.H., a male child born on November 24, 2013. A.H. was born prematurely at 31 weeks of gestation. At birth, A.H. weighed 3.69 pounds and tested positive for cocaine. Medical staff immediately placed A.H. in the Neonatal Intensive Care Unit (NICU) at Hennepin County Medical Center. During the first week of December, A.H.'s mother, P.J.M., was no longer allowed to breastfeed because toxicology testing of her breast milk showed the presence of cocaine. A.H.'s urine also tested positive for cocaine.

A.H. remained in the hospital for 50 days. During that time, father was arrested, along with mother and two other males, for loitering in Minneapolis. At the time of his arrest, father possessed drug paraphernalia and told the police that he was a crack cocaine addict with a "100 dollar a day habit." From December 21 through January 5, 2014, father did not visit A.H. in the NICU.

On January 9, respondent Hennepin County Human Services and Public Health Department (department) filed a child in need of protection or services petition regarding A.H. Three days later, A.H. was released from the hospital and placed in a nonrelative foster home. On February 19, the district court adjudicated A.H. in need of protection or services and transferred legal custody of the child to the department. A.H. remained in foster care. On August 7, the department petitioned to terminate parental rights or to transfer permanent legal and physical custody of A.H. Father was personally served with the petition on August 26. The matter came on for trial on October 28. Mother did not appear, and the district court granted the county's motion to proceed against mother by

default. Father appeared for trial and was represented by counsel. The district court's resulting findings of fact are summarized below.

Father was born in 1979 and was diagnosed with schizophrenia when he was 18 years old. Father has also been diagnosed with depression and anxiety. He started using marijuana at the age of 9, alcohol at the age of 12, and has used cocaine, ecstasy, and nicotine regularly during his adult life. Father has never been employed full time during his adult life and receives disability payments based on his schizophrenia. He has two other children who live in Milwaukee with their mothers, and he is not the primary parent for either child.

The department offered father a voluntary case plan to address his longstanding mental-health and chemical-dependency issues. The department developed the case plan with father's input, father signed the case plan on January 27, 2014, and father agreed that he needed the services outlined in the plan to help him meet A.H.'s needs. As part of the case plan, father agreed to complete a chemical-dependency evaluation and follow its recommendations, complete chemical-dependency treatment, submit to random urinalyses as requested, participate in supervised visitation with A.H., address his mental-health needs through an updated psychological evaluation and any medications as recommended, cooperate and maintain regular contact with his county-assigned social worker, and participate in parenting assessment or education as recommended.

On January 14, father completed a Rule 25 assessment with an evaluator from Park Avenue Center. Father reported that, on a daily basis, he was using marijuana, cocaine, and nicotine, and drinking a half-pint of alcohol. The evaluator concluded that

father had cannabis- and stimulant-related use disorders and that his risk of relapse was "extremely high" because he had "no awareness of the negative impact of mental health problems or substance use" and "no coping skills to arrest mental health or addiction illnesses." In February, father entered a six-week inpatient treatment program at Park Avenue Center. During his treatment, he underwent a mental-health intake and reported that for ten years, he had regularly taken Seroquel for schizophrenia, Prozac for depression, and Xanax for anxiety. Park Avenue Center discharged father from the program at the end of March because he left the program without permission. Park Avenue Center's discharge report states that father lacked impulse control and coping skills, returned to alcohol use, and broke treatment rules, resulting in a step down to outpatient treatment. The report also states that father submitted two positive UAs for cocaine and alcohol, denied cocaine use despite the positive UAs, and refused to provide UAs on other occasions. The discharge report concludes that father appeared highly vulnerable for further use, as indicated by his inability to identify the negative impact of his continued use and the impact it would have on his son.

In June, father entered Twin Town men's residential treatment center for inpatient chemical-dependency treatment. Twin Town discharged father six days later. Father did not enroll in another treatment program or seek an updated Rule 25 assessment after his discharge from Twin Town.

Father missed one appointment for an updated psychological evaluation in April, but completed an evaluation in June. The evaluator recommended that father take psychotropic medication as prescribed, attend psychiatric appointments, meet with his

4

mental-health case manager, follow the Rule 25 recommendations, complete a more thorough psychological evaluation, and participate in informal support groups such as Alcoholics Anonymous, Narcotics Anonymous, and Recovery Church. Father partially complied with the recommendations. He took his medications as prescribed. He met with his mental-health case manager, but only until June. He also sporadically attended support-group meetings. He did not follow any of the other recommendations.

Father attempted to maintain contact with his social worker by calling and leaving messages for her, even after he no longer had his own phone. But it was difficult for the social worker to successfully return the calls because the telephone numbers father left for return calls were disconnected, not working, or answered by individuals who said they were not in contact with father. With regard to drug and alcohol testing, father had at least 41 positive or missed UAs and six negative UAs. Father blamed his missed UAs on the lack of a cell phone.

Father completed eight classes at Urban Ventures Leadership Foundation Parenting program. He did not complete any additional parenting education or assessment. From February through June, father attended 19 supervised visits with A.H. and was always "very loving and appropriate" during the visits. But father did not visit A.H. after June 23.

The district court found that the department made reasonable efforts to prevent A.H.'s continued placement in foster care and to return A.H. to his parents, including child-protection case management, child-services case management, kinship-search services, a Rule 25 chemical-health assessment, chemical-dependency treatment, random

5

UAs, mental-health evaluations, a parenting assessment, and supervised visitation. The district court found that father has "not sufficiently engaged in [his] case plan[] and [has] only minimally participated in services." The district court found that given father's "history with chemical dependency and mental illness, and his failure to document sobriety . . . and mental health stability, placing [A.H.] in his care would create a safety risk to the child." The district court noted that although father self-reported some progress on his mental-health issues, his efforts ceased in June. The district court determined that reunification with father is not possible in the reasonably foreseeable future.

The district court concluded that father "continually failed to comply with the duties imposed by the parent and child relationship"; is "palpably unfit to be a party to the parent-child relationship because of his inability to address his longstanding chemical dependency"; failed to correct the conditions leading to A.H.'s out-of-home placement; and that A.H. is neglected and in foster care.

The district court also concluded that termination of parental rights is in A.H.'s best interests. The district court reasoned that although father loves A.H., A.H. has never lived with father, A.H. has been in out-of-home placement since birth, father has not visited A.H. on a consistent basis, and A.H. has not truly bonded with father. The district court further reasoned that the "child's need for stability, a safe home environment, appropriate medical care, and need for permanency" outweigh father's "preferences, interests, and desire to parent."

6

The district court terminated mother's and father's parental rights to A.H. Father appeals.

**D E C I S I O N**

"[P]arental rights may be terminated only for grave and weighty reasons." *In re Welfare of Child of W.L.P.*, 678 N.W.2d 703, 709 (Minn. App. 2004). A district court's decision in a termination proceeding must be based on evidence concerning the conditions that exist at the time of trial. *In re Welfare of Child of T.D.*, 731 N.W.2d 548, 554 (Minn. App. 2007). An appellate court "exercises great caution in termination proceedings, finding such action proper only when the evidence clearly mandates such a result." *In re Welfare of S.Z.*, 547 N.W.2d 886, 893 (Minn. 1996). On appeal we examine the record to determine whether the district court applied the appropriate statutory criteria and made findings that are not clearly erroneous. *In re Welfare of D.L.R.D.*, 656 N.W.2d 247, 249 (Minn. App. 2003). A finding is clearly erroneous when "it is either manifestly contrary to the weight of the evidence or not reasonably supported by the evidence as a whole." *In re Welfare of Children of T.R.*, 750 N.W.2d 656, 660-61 (Minn. 2008) (quotation omitted). We give the district court's decision to terminate parental rights considerable deference, but we "closely inquire into the sufficiency of the evidence to determine whether it was clear and convincing." *In re Welfare of Children of S.E.P.*, 744 N.W.2d 381, 385 (Minn. 2008).

An appellate court will affirm the district court's decision to terminate parental rights if the department made reasonable efforts to reunite the family, at least one statutory ground for termination is supported by clear-and-convincing evidence, and

7

termination is in the best interests of the child. *Id*. In this case, the district court concluded that the department made reasonable efforts to reunite A.H. with father. The district court identified four statutory grounds for termination: Minn. Stat. § 260C.301, subd. 1(b)(2), (4), (5), (8) (2014), which provide that the district court may terminate parental rights if "the parent has substantially, continuously, or repeatedly refused or neglected to comply with the duties imposed upon that parent by the parent and child relationship"; "a parent is palpably unfit to be a party to the parent and child relationship"; "following the child's placement out of the home, reasonable efforts, under the direction of the court, have failed to correct the conditions leading to the child's placement"; or "the child is neglected and in foster care." And, the district court concluded that termination of father's parental rights is in A.H.'s best interests.

Father makes four arguments in support of reversal. We address each in turn.

**I.**

Father argues that the district court "erred in terminating [his] parental rights for failing to comply with voluntary case-planning services." *See In re Child of Simon*, 662 N.W.2d 155, 163 (Minn. App. 2003) (stating, in the context of a termination under Minn. Stat. § 260C.301, subd. 1(b)(2), that a father's "failure to satisfy key elements of the court-ordered case plan provides ample evidence of his lack of compliance with the duties and responsibilities of the parent-child relationship"). Father emphasizes that his case plan was not court-ordered. But father does not cite relevant precedential authority establishing that evidence supporting the statutory grounds for termination may not be

8

based on noncompliance with a voluntary case plan.[1] Instead, father cites *In re Welfare of Child of B.J.-M.*, 744 N.W.2d 669, 673 (Minn. 2008), which held that "the failure to name [the child's father] as a party in a petition requires reversal of the juvenile court order terminating his parental rights." *B.J.-M.* does not address whether a parent's failure to comply with a voluntary case plan can be used as evidence to establish the statutory grounds for termination. The case therefore does not support father's position.

We note that the department developed the case plan with father's input, father signed the case plan, and father agreed that he needed the services outlined in the case plan to help him meet A.H.'s needs. Under the circumstances, we do not see how the district court erred by considering father's failure to complete the case-plan services when determining whether his parental rights should be terminated. In sum, father has not shown that the district court erred by partially relying on father's case-plan failures as support for its conclusion that statutory grounds for termination were proved.

**II.**

Father argues that the record "does not contain clear and convincing evidence to support termination of parental rights under any of the four statutory grounds." At least one statutory ground for termination must be supported by clear-and-convincing evidence. *S.E.P.*, 744 N.W.2d at 385. The district court concluded that father is palpably

---

[1] Father's reliance on an unpublished decision of this court is misplaced. *See* Minn. Stat. § 480A.08, subd. 3 (2014) (stating that unpublished decisions of this court "must not be cited as precedent, except as law of the case, res judicata, or collateral estoppel" and that "[u]npublished opinions of the Court of Appeals are not precedential").

unfit. A district court may terminate parental rights to a child if the district court finds that the parent

> is palpably unfit to be a party to the parent and child relationship because of a consistent pattern of specific conduct before the child or of specific conditions directly relating to the parent and child relationship either of which are determined by the court to be of a duration or nature that renders the parent unable, for the reasonably foreseeable future, to care appropriately for the ongoing physical, mental, or emotional needs of the child.

Minn. Stat. § 260C.301, subd. 1(b)(4). "[T]he county must prove a consistent pattern of specific conduct or specific conditions existing at the time of the hearing that, it appears, will continue for a prolonged, indefinite period and that are permanently detrimental to the welfare of the child." *T.R.*, 750 N.W.2d at 661.

The district court concluded that father "has demonstrated a persistent pattern of chemical dependency combined with a major mental illness that renders him palpably unfit to parent his child for the foreseeable future." Clear-and-convincing evidence in the record supports this conclusion. The record shows that father has a long history of chemical-dependency and mental-health issues. Father attempted treatment twice during the pendency of this case and failed both times. Father made no further attempt at treatment. His UAs tested positive for cocaine and alcohol. As to mental health issues, father initially followed some of the recommendations of his psychological evaluation, but not all. He stopped visiting his mental-health case manager in June. He also stopped visiting A.H. in June. Lastly, father agreed that he needed the services outlined in his case plan to help him meet A.H.'s needs, but he did not complete those services.

10

Father argues that the record shows "little more than that he uses alcohol, marijuana, and cocaine and that he has a couple of mental-health diagnoses" and that it does not show that his "use of intoxicants and the mental health problem" renders him "unable, for the foreseeable future, to properly care for the child." Father minimizes his chemical-dependency and mental-health issues and their impact on his fitness as a parent. Moreover, father's failure to successfully address those issues during the pendency of the case demonstrates that he will be unfit to parent for the foreseeable future. We note that father admitted at trial that he could not effectively parent his child if he is using drugs.

The district court's conclusion that father is palpably unfit to parent is supported by clear-and-convincing evidence. Because this statutory ground is adequately supported, we do not review the district court's reliance on other statutory grounds. *See S.E.P.*, 744 N.W.2d at 385 (stating that this court will affirm the district court's decision to terminate parental rights if at least one statutory ground for termination is supported by clear-and-convincing evidence).

### III.

Father argues that "termination of his . . . parental rights does not serve [A.H.'s] best interests." In every termination proceeding, "the best interests of the child must be the paramount consideration." Minn. Stat. § 260C.301, subd. 7 (2014). Even if a statutory ground for termination exists, the district court must still find that termination of parental rights is in the best interests of the child. *In re Children of T.A.A.*, 702 N.W.2d 703, 708 (Minn. 2005). "In analyzing the best interests of the child, the court must balance three factors: (1) the child's interest in preserving the parent-child relationship;

11

(2) the parent's interest in preserving the parent-child relationship; and (3) any competing interest of the child." *In re Welfare of Child of W.L.P.*, 678 N.W.2d 703, 711 (Minn. App. 2004) (quotation omitted). "Competing interests include such things as a stable environment, health considerations and the child's preferences." *In re Welfare of R.T.B.*, 492 N.W.2d 1, 4 (Minn. App. 1992). "Where the interests of parent and child conflict, the interests of the child are paramount." Minn. Stat. § 260C.301, subd. 7. "We review a district court's ultimate determination that termination is in a child's best interest for an abuse of discretion." *In re Welfare of Children of J.R.B.*, 805 N.W.2d 895, 905 (Minn. App. 2011), *review denied* (Minn. Jan. 6, 2012).

The district court provided a detailed best-interest analysis, balancing preservation of the parent-child relationship against A.H.'s competing interests. The district court reasoned that although father loves his child, A.H. has not truly bonded with father and that the "evidence demonstrates that both parents' behavior has negatively impacted the child." The district court further reasoned that the "child's need for stability, a safe home environment, appropriate medical care, and need for permanency" outweigh father's "preferences, interests, and desire to parent." The district court summarized the reasons that termination of parental rights is in A.H.'s best interests: (1) "[t]he parents will not be able to care for [A.H.] in the reasonably foreseeable future," (2) "[n]either parent has demonstrated an ability to address [the] issues that negatively impact their ability to parent," and (3) "[i]t is in the best interests of [A.H.] to be placed in a home with parents who can meet his needs and provide him with love, stability, and safety," and "a termination of parental rights would free [A.H.] for adoption."

12

Father asserts that the record shows only that he "has a relatively minor problem with intoxicant use" and a "relatively minor mental health problem." The record refutes that assertion. The district court did not abuse its discretion by concluding that termination of father's parental rights is in A.H.'s best interests.

**IV.**

Father argues that the district court "erred in its decision not to transfer legal custody of [A.H.] to [his] mother." "Termination of parental rights and adoption, or guardianship to the commissioner of human services through a consent to adopt, are *preferred* permanency options for a child who cannot return home." Minn. Stat. § 260C.513(a) (2014) (emphasis added). "*If* the court finds that termination of parental rights and guardianship to the commissioner is not in the child's best interests, the court may transfer permanent legal and physical custody of the child to a relative when that order is in the child's best interests." *Id.* (emphasis added).

The district court reasoned that because it found termination of parental rights is in A.H.'s best interests, it need not consider the alternative of transfer of legal custody. Nonetheless, the district court concluded that, "at this time, the court does not have any ground on which to conclude that transfer of legal custody would be in the child's best interests," and provided a thorough explanation to support its conclusion. Moreover, the district court noted that "[i]f any family member of either the mother or the father wishes to provide permanency for the child, he or she may do so through the adoption process." The district court's reasoning and decision regarding the proposed legal custody transfer is consistent with the controlling statute and does not constitute reversible error.

13

Father also argues that the department violated its statutory duty to conduct a relative-placement search, that there should be a sanction for the failure, and that the sanction should be reversal of the order terminating his parental rights. *See* Minn. Stat. §§ 260.012(e)(3) (2014) (including a relative search among reasonable-efforts requirements); 260C.212, subd. 2(a)(1) (2014) (listing "an individual who is related to the child by blood, marriage, or adoption" as the first placement choice for a child placed out of home); 260C.215, subd. 1 (2014) (requiring "special efforts to recruit a foster family from among the child's relatives"); 260C.219(b)(5) (2014) (requiring notice that "first consideration [is given] for placement with relatives"); 260C.221 (2014) (setting forth relative-search requirements).

Father contends that the department inexcusably delayed initiation of the Interstate Compact on the Placement of Children (ICPC) process, *see* Minn. Stat. §§ 260.851, 260.93 (2014), which was necessary to facilitate placement with his mother. Father argues that the delay "precluded a transfer of legal custody and led directly to an unnecessary termination of parental rights."

"Once a child alleged to be in need of protection or services is under the court's jurisdiction, . . . the court must ensure that the responsible social services agency makes reasonable efforts to finalize an alternative permanent plan for the child as provided in paragraph (e)." Minn. Stat. § 260.012(a) (2014). Subpart (e) provides, "'Reasonable efforts to finalize a permanent plan for the child' means due diligence by the responsible social services agency to: . . . conduct a relative search to identify and provide notice to adult relatives" and "when the child cannot return to the parent or guardian from whom

14

the child was removed, to plan for and finalize a safe and legally permanent alternative home for the child, and consider[] permanent alternative homes for the child inside or outside of the state, preferably through adoption or transfer of permanent legal and physical custody of the child." *Id.* (e), (e)(3), (e)(5).

The district court considered and rejected father's challenges to the adequacy of the department's relative search in its orders terminating father's parental rights and denying father's motion for a new trial. The district court was satisfied

> that the department exercised reasonable efforts in conducting the [relative] search in this case. . . . Many factors go into the department's determination of how much time should be allocated to investigating individuals provided by [parents] as placement and permanency options. Further, as [the department] testified, the Interstate Compact on the Placement of Children (ICPC) process can take a substantial amount of time and resources, thus it necessitates full and unwavering commitment from a potential placement individual. The court finds [the department's] testimony to be credible that [paternal grandmother] brought a number of concerns to [the department's] attention prior to fully committing to be a permanency option . . . , and an ICPC for [paternal grandmother] was initiated shortly thereafter.

The district court's reasonable-efforts finding was based on conflicting testimony regarding when paternal grandmother unconditionally committed to serve as a permanent placement for A.H. The district court's resolution of the conflicting testimony is based on a credibility determination to which we defer, and the resulting reasonable-efforts finding is not clearly erroneous. *See In re Welfare of L.A.F.*, 554 N.W.2d 393, 396 (Minn. 1996) ("Considerable deference is due to the district court's decision [to terminate

15

parental rights] because a district court is in a superior position to assess the credibility of witnesses.").

Moreover, the district court found that

> absent a compliant father capable of keeping [A.H.] safe (given [father's] expressed desires and likely access to [A.H.] if placed with [father's mother]), [a transfer of legal custody to paternal grandmother] is not an appropriate permanency option given the age of [A.H.] and his need for long-term safety and stability. It is also not a preferred permanency option and there is nothing in the record to indicate that a termination of parental rights and guardianship . . . is not in [A.H's] best interests. Accordingly, *even if the ICPC had been completed, the Court could not conclude that a transfer of legal custody is in the best interests of [A.H.].*

(Emphasis added).

That finding belies father's argument that the alleged failure to timely initiate the ICPC process resulted in an "unnecessary" termination. The district court's finding that a transfer of legal custody would not have been in A.H.'s bests interests even if the ICPC process had been completed before trial shows that the alleged error does not impact the validity of the termination order. The alleged error therefore could not provide a basis for reversal. *See Midway Ctr. Assocs. v. Midway Ctr., Inc.*, 306 Minn. 352, 356, 237 N.W.2d 76, 78 (1975) (stating that to prevail on appeal, an appellant must show both error and prejudice resulting from the error); *In re Welfare of Children of J.B.*, 698 N.W.2d 160, 171 (Minn. App. 2005) (applying *Midway* in a termination-of-parental-rights case).

Lastly, we note, as the district court did, that if paternal grandmother wishes to provide a permanent placement for A.H., she may seek that relief in the post-termination

adoption-placement process. *See* Minn. Stat. § 260C.607, subd. 6(a) (2014) (setting forth procedure for a relative to move for an order for adoptive placement).

In conclusion, we have no reason to doubt that father loves A.H. and wants to parent him. But the district court applied the appropriate statutory criteria, made findings that are not clearly erroneous, and its termination order is supported by clear-and-convincing evidence. Giving considerable deference to the district court's decision, there is no basis for this court to reverse.

**Affirmed.**